[No. 32712.  *En Banc.*  June 3, 1954.]

THE GREYHOUND CORPORATION (NORTHWEST GREYHOUND LINES DIVISION), *Appellant,* v. DIVISION 1384 OF THE AMALGAMATED ASSOCIATION OF STREET, ELECTRIC RAILWAY AND MOTOR COACH EMPLOYEES OF AMERICA *et al., Respondents and Cross-appellants.*[1]

[1] Reported in 271 P. (2) 689.

*Macbride, Matthews & Hanify,* for appellant.

*Edgar R. Rombauer,* for respondents and cross-appellants.

FINLEY, J.—This is an action for a declaratory judgment.

The Greyhound Corporation (Northwest Greyhound Lines Division), hereinafter referred to as Greyhound, and Division 1384 of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America (an unincorporated association), hereinafter referred to as the Union, are parties to a collective bargaining agreement.

The preamble of the agreement states:

*"The purpose of this Agreement is to provide a working understanding* between the COMPANY and its employees covered hereby, through their duly accredited representatives, affecting hours of labor, wages and basic working

conditions, *and to establish a means of settling any and all grievances, disputes and controversies arising hereunder between the* COMPANY *and such employees* and pursuant to said purpose the parties hereto agree as follows:" (Italics ours.)

The agreement contains an arbitration provision, reading in part as follows:

"The Company *agrees to meet and treat* with the duly accredited officers and committees of the Association on *all questions* relating to the interpretation or application of the provisions of this Agreement, and should *any differences arise between them* which cannot be *mutually adjusted,* the same shall be submitted at the written request of either party to a Board of Arbitration to be elected forthwith in the manner following:" (Italics ours.)

The agreement also contains several provisions (discussed hereinafter) concerning wages and working conditions of bus drivers employed by Greyhound in the operation of its facilities in the northwest.

Greyhound issued certain instructions which, as apparently conceded by the parties, required certain changes in the work or duty to be performed for the company by *certain* of its bus drivers. These changes will be described hereinafter.

The Union raised certain objections, apparently claiming that the changes in the duties or working conditions of the bus drivers, contemplated by Greyhound's instructions, were unauthorized and prohibited by the provisions of the collective bargaining agreement between the parties. The Union demanded that the matter be submitted to arbitration. Greyhound refused to arbitrate and commenced this lawsuit, asking that the trial court enter a declaratory judgment to the effect, (a) that provisions of the collective bargaining agreement clearly permitted the action contemplated by the company; (b) that the objections of the Union to the changes contemplated by Greyhound were without merit; and lastly, (c) that no debatable question or arbitrable matter existed between the parties. The Union demurred to Greyhound's complaint and interposed a motion,

*apparently based upon provisions of the state arbitration act,* asking for a stay of the declaratory judgment proceedings and an order directing that the matter be submitted to arbitration for a determination of the rights of the parties. The Union's motion to submit to arbitration was denied, but the trial court sustained the Union's demurrer and dismissed Greyhound's complaint with prejudice. Greyhound has appealed from the trial court's action on the demurrer. The Union has cross-appealed from the denial of its motion by the trial court.

The basic purpose of arbitration is the settlement of disputes by extrajudicial means. The history of arbitration shows that, for a variety of reasons which we need not detail here, it has not been uniformly accepted and approved by the courts of our country or elsewhere. In fact, a majority of the state courts, from an early date in the history of arbitration, adhered to the restrictive common-law rule, that parties by agreements to arbitrate cannot oust the courts of jurisdiction, and that such agreements *were revokable at the will of the parties thereto.* In a number of states, the restrictive common-law rule has been modified by legislative action. At an early date in our state, apparently the concept of arbitration was regarded favorably by the territorial legislature and was given positive recognition in the enactment of § 264 of the Code of 1881 (Rem. Rev. Stat., § 420 *et seq.*). This early enactment was superseded by the arbitration act of 1943 (Chapter 138, Laws of 1943, p. 425, Rem. Supp. 1943, § 430-1, *et seq.*). Section 1 of our 1943 act (Rem. Supp. 1943, § 430-1) stated:

"Two or more parties may agree in writing to submit to arbitration, in conformity with the provisions of this act, any controversy which may be the subject of an action existing between them at the time of the agreement to submit, or they may include in a written agreement a provision to settle by arbitration any controversy thereafter arising between them out of or in relation to such agreement. *Such agreement shall be valid, enforceable and irrevocable* save upon such grounds as exist in law or equity for the revocation of any agreement.

"The *provisions of this act shall not apply to any arbitra-*

*tion agreement between employers and employees or between employers and associations of employees, unless such agreement specifically provides that it shall be subject to the provisions of this act."* (Italics ours.)

In *Sullivan v. Boeing Aircraft Co.,* 29 Wn. (2d) 397, 187 P. (2d) 312, 174 A. L. R. 566, apparently a question was raised in the trial court as to whether the arbitration provisions of a collective bargaining agreement were valid. On appeal, the decision of the trial court was reversed on other grounds and the question of the validity of the arbitration provisions was left unanswered. Apparently at the time, numerous then existing *collective bargaining agreements* contained arbitration clauses which may not have referred to the state arbitration act in a manner to remove all doubt as to the validity of such arbitration clauses. At the next legislative session (1947), the second paragraph of § 1 of the arbitration act of 1943 was amended to read (RCW 7.04.010):

"The provisions of this chapter shall not apply to any arbitration agreement between employers and employees or between employers and associations of employees, *and as to any such agreement the parties thereto may provide for any method and procedure for the settlement of existing or future disputes and controversies, and such procedure shall be valid, enforceable and irrevocable save upon such grounds as exist in law or equity for the revocation of any agreement."* (Italics ours.)

Perhaps, the purpose of the 1947 amendment was to remove the doubts occasioned by the action of the trial court in the *Sullivan* case, *supra,* as to the validity of the arbitration clauses in the then existing collective bargaining agreements. At any rate, it appears to us that the 1947 amendment clearly accomplished such a result. In other words, under our reading of the 1947 amendment, the parties to collective bargaining agreements still have an option to provide by specific agreement that the procedures of the act of 1943 shall be applicable and available to them in applying or enforcing the provisions of arbitration clauses; or they may agree upon arbitration procedures other than those under the act. But, irrespective of election by agree-

ment to use or not to use the procedures provided in the act, arbitration clauses agreed upon by the parties and inserted in collective bargaining contracts are not subject to the common-law rule permitting revocation at the will of the parties. Arbitration clauses are valid, binding and enforcible by appropriate action of the parties in our state courts.

■ The arbitration practice or procedure to be followed by the parties to a collective bargaining contract is simply a matter for them to work out by agreement in drawing up the arbitration clause of such agreements, and they will be bound by the terms of their agreements. This analysis of § 1 of the state arbitration act, as amended in 1947 by the legislature, is consistent with the view taken by this court in a rather impressive line of cases, beginning with *Dickie Mfg. Co. v. Sound Constr. & Engineering Co.*, 92 Wash. 316, 159 Pac. 129, and ending with *In re Arbitration Puget Sound Bridge & Dredging Co. v. Lake Washington Shipyards*, 1 Wn. (2d) 401, 96 P. (2d) 257.

In the *Dickie* case, *supra*, we said:

"Much confusion has been brought into our arbitration practice by common law doctrines and decisions under statutes of other states, nor have the opinions of this court been entirely harmonious."

In the *Lake Washington* case, *supra*, we said:

"Contrary to the practice and procedure in the vast majority of the states, this jurisdiction does not recognize or permit common law arbitration, one of the distinguishing features of which is that an agreement for such arbitration is revocable. In this state, the proceeding is wholly statutory, and the rights of the parties thereto are governed and controlled by statutory provisions. *Dickie Mfg. Co. v. Sound Const. & Eng. Co.*, 92 Wash. 316, 159 Pac. 129; *Suksdorf v. Suksdorf*, 93 Wash. 667, 161 Pac. 465; *Puget Sound Bridge & Dredging Co. v. Frye*, 142 Wash. 166, 252 Pac. 546; *Smith v. Department of Labor & Industries*, 176 Wash. 569, 30 P. (2d) 656; *Fisher Flouring Mills Co. v. United States* (Wash.), 17 F. (2d) 232. Compare, *Gord v. Harmon & Co.*, 188 Wash. 134, 61 P. (2d) 1294."

We shall now consider the action of the trial court in denying the Union's motion, (a) for a stay of the lawsuit started by Greyhound in the superior court, and (b) the application of the Union for an order directing Greyhound to submit the particular controversy to arbitration. As pointed out hereinbefore, and in Greyhound's brief here on appeal, we see then: First, that the state arbitration act, as enacted in 1943, specifically provided that the act should not apply to collective bargaining agreements, " . . . unless such agreement specifically provides that it shall be subject to the provisions of this act  . . . ;" but, secondly, that, in 1947, the legislature amended § 1 of the 1943 arbitration act to read as follows:

"The provisions of this act shall not apply to any arbitration agreement between employers and employees or between employers and associations of employees, *and as to any such agreement the parties thereto may provide for any method and procedure for the settlement of existing or future disputes and controversies, and such procedure shall be valid, enforceable and irrevocable save upon such grounds as exist in law or equity for the revocation of any agreement.*" (Italics ours.)

We particularly emphasize here the latter or italicized portion of § 1, quoted above.

The Union's motion for a stay of action pending arbitration, filed in the superior court, apparently was based upon provisions of the state arbitration act, particularly on RCW 7.04.030, which reads as follows:

"If any action for legal or equitable relief or other proceedings is brought by any party to a written agreement to arbitrate, *the court* in which such action or proceeding is pending upon being satisfied that any issue involved in such action or proceeding is referable to arbitration under such agreement, *shall, on motion of any party to the arbitration agreement, stay the action or proceeding until an arbitration has been had in accordance with the agreement.*" (Italics ours.)

The collective bargaining agreement between Greyhound and the Union *contains no language* by which the procedures contemplated by the state arbitration act can be

available to either the Union or to Greyhound. It follows that the Union could not rely upon provisions of the arbitration act to support the motion in which the Union sought to stay the court proceedings and to obtain an order directing Greyhound to submit to arbitration. The trial court had no alternative but to deny the motion of the Union.

Now as to the filing of the demurrer by the Union and the action of the trial court sustaining it and dismissing Greyhound's complaint with prejudice, there are two underlying questions to be considered: (1) Whether there is merit in Greyhound's contention that the dispute between the parties involves no debatable question and is not a bona fide dispute, but merely a contentious or frivolous one which should not be submitted to arbitration; and (2) whether the language of the arbitration clause is so broad in scope that the parties are required thereby to submit *all* controversies to arbitration, despite the fact that some particular controversy may be characterized as frivolous, or not bona fide. In considering the foregoing questions, we must outline the facts involved in this matter as it comes to us here on appeal.

During argument here, counsel for Greyhound indicated that the company was faced with a significant operations problem because of the limited space available at the Seattle bus terminal for the parking of busses and the accommodation of bus driver personnel during lay-over periods of thirty minutes or more between the arrival and departure of scheduled bus runs; and that, in issuing the instructions (questioned by the Union, as referred to above), the company hoped to relieve the congested situation at the terminal. In other words, under the new instructions, the bus drivers concerned would lay over at the *bus garage* rather than at the *passenger terminal*, after arrival and unloading their busses at the terminal; also, the drivers would be required to drive their busses to the garage, where they would be parked away from the bus terminal during the lay-over period. After the lay-over period, the busses would be driven back to the terminal by the drivers for the resumption of unfinished portions of their scheduled bus runs.

Greyhound claims that the collective bargaining agreement divides bus drivers into three classifications: (1) drivers on regularly scheduled runs, other than local trips; (2) drivers on regularly scheduled runs, local trips; (3) extra board, or relief drivers. Greyhound's amended complaint alleges that the contemplated changes in its operations relative to lay-over periods will affect only the second classification of drivers, mentioned above; namely, the regular drivers operating regular runs, limited to local trips (within the territory bounded by Bellingham on the north, Auburn on the southeast, and Olympia on the south).

It is emphasized that rule 55 of the collective bargaining agreement relative to the "shopping of busses" imposes a duty upon bus drivers on regular runs, other than local trips (classification (1) above), to drive their busses from terminal to garage and return, and allows them twenty-five cents extra pay for such "shopping of busses."

Greyhound contends that regular drivers, assigned to local trips (classification (2) above) are paid on an hourly basis; that their pay continued whether such drivers stayed at the terminal or at the garage during the lay-over period. In other words, they are on duty and are paid on an hourly basis for lay-over time, and the company has the right to require such drivers to shop or drive their particular busses from terminal to garage and return during the lay-over time as a legitimate part of their work. The argument is somewhat convincing. But the same thing might be said of other than local trip, regular run, drivers,—that is, drivers in classification (1) above. Although the latter drivers are paid primarily on a mileage basis, nevertheless, they are entitled to minimum hourly pay and to minimum daily pay. Furthermore, rule 59 (located in the section of the agreement generally referring to regular, local trip, drivers) employs very general language, indicating that "regular runs of 175 to 210 miles . . . shall be classed as a full day's work for which eight hours time will be paid." Consequently, it can be said that drivers in classification (1) also draw their pay on an hourly or daily basis, irrespective of duties performed.

Section 1—General, 2. (a), of the collective bargaining agreement, reads:

"2. (a) All employees shall be governed by the Rules and Regulations contained in the COMPANY Manual, supplements thereto, or reissues thereof, and shall observe all special orders or bulletins issued from time to time, or orders conveyed by officers of the COMPANY or their duly authorized representatives, provided they do not conflict with this Agreement."

Rule 19 of § 2 of the agreement reads:

"19. Regular Service to be Set Up into Runs: Insofar as possible, the Company will endeavor to set all regular service into operators' runs. The Company shall have the right to rearrange present and/or future runs, and the rate of pay of each run will be subject to the provisions of this Agreement."

Greyhound apparently relies most strongly upon the two above-quoted sections of the agreement, which, according to Greyhound, permit the company (in exercising management functions) to put into effect the allegedly reasonable changes contemplated by the instructions revising the duties of regular run, local trip drivers. Greyhound further asserts that the contract with the Union contains no provisions that prohibit the changes.

Greyhound urges that it is a well established general principle of law that arbitration clauses do not require bad faith, frivolous disputes, to be submitted to arbitration; and that the courts will examine alleged disputes to determine whether they are bona fide or not. In connection with this argument, Greyhound cites *Textile Workers' Union v. Firestone Plastics Division*, 6 N. J. Super. 235, 70 A. (2d) 880; *Machine Printers Beneficial Ass'n v. Merrill Textile Print Works*, 12 N. J. Super 26, 78 A. (2d) 834; and *International Ass'n of Machinists v. Cutler-Hammer, Inc.*, 271 App. Div. 917, 67 N. Y. S. (2d) 317, affirmed 297 N. Y. 519, 74 N. E. (2d) 464, quoting from the *Cutler-Hammer* case as follows:

"The clause of. the agreement that 'the Company agrees to meet with the Union early in July 1946 to discuss payment of a bonus for the first six months of 1946' can only mean what it says, that the parties will *discuss* the subject. While

the contract provides for arbitration of disputes as to the 'meaning, performance, non-performance or application' of its provisions, the mere assertion by a party of a meaning of a provision which is clearly contrary to the plain meaning of the words cannot make an arbitrable issue. It is for the court to determine whether the contract contains a provision for arbitration of the dispute tendered, and in the exercise of that jurisdiction the court must determine whether there is such a dispute. If the meaning of the provision of the contract sought to be arbitrated is beyond dispute, there cannot be anything to arbitrate and the contract cannot be said to provide for arbitration."

The Union frankly concedes that Greyhound is entitled to management prerogatives under the collective bargaining agreement unless provisions of the agreement are in conflict with the exercise of such prerogatives. It is on the latter point that the Union bases its contentions that Greyhound's instructions are improper; and that they have given rise to a legitimate dispute or a debatable question which should be submitted to arbitration; and furthermore, that the language of the arbitration clause is sufficiently broad to require that all *controversies* between the parties be submitted to arbitration.

The Union refers to rule 25 of the agreement, claiming that the instructions issued by Greyhound contemplate *extra work* for regular drivers, and that, under rule 25, *"regularly assigned operators* shall be used for *extra* work *only* when *extra operators are not available* for service."* (Italics ours.) The Union refers to rule 62 of the agreement (relating to hours of service for regular drivers), and claims this particular rule provides "for such duties as driving busses to loading point, loading and unloading at terminals, laying at terminals with bus waiting for leaving time, and returning bus to garage or terminal . . .," but that this particular rule is silent as to any duty on the part of regular drivers to drive their busses from terminal to garage and return during lay-over periods at a bus terminal. The Union further refers to rule 66 of the agreement (relating to *station duty*), and claims that this rule concerns only extra drivers and requires of such drivers on station duty "the

shuttling of busses." In other words, it is contended by the Union that the phrase, "shuttling of busses," contained in rule 66, specifically requires *extra drivers* to perform the duty or work which Greyhound's instructions seek to impose upon *regular* drivers—namely, the driving of busses by their drivers from terminal to garage and return during lay-over time at the bus terminal.

Thus, the Union urges that the provisions of the collective bargaining agreement relative to management prerogatives and to wages, duties, and working conditions of drivers, do not clearly permit Greyhound to make the contemplated changes; hence, that a bona fide dispute exists, and that, in any event, the language of the arbitration clause is so broad in scope as to require the alleged dispute to be submitted to arbitration.

We have carefully examined the provisions of the collective bargaining agreement referred to by Greyhound as supporting its claim that the new procedure as to lay-over time is clearly within the company's management prerogatives. Similarly, we have examined the provisions of the agreement referred to by the Union as raising a question concerning the right of Greyhound to put the new instructions into operation. It seems to us that the provisions of the collective bargaining agreement, referred to by the parties in their briefs and arguments here on appeal, indicate that a justiciable controversy exists between them *in so far as the declaratory judgment act* is concerned. This seems to be conceded by all concerned. It is our best judgment that the alleged dispute is more than a frivolous or contentious one. We are convinced that a bona fide dispute, or a debatable question, exists between the parties as to the interpretation of the contract, and that the matter cannot be resolved as a question of law merely by reference to provisions of the collective bargaining agreement cited to us by Greyhound.

From the views just expressed, it is apparent that Greyhound can find no solace in the cases cited for the proposition that the courts will relieve a party of the obligation of submitting a contentious, frivolous, controversy to arbitration;

that is, Greyhound has not made out a case which meets the test necessary for application of the proposition announced in the *Cutler-Hammer,* case, *supra.*

The rule urged by Greyhound, that bad faith or frivolous disputes need not be submitted to arbitration, has not been passed upon by this court. *International Ass'n of Machinists Local v. Cutler-Hammer, Inc., supra,* cited by appellant in support of the rule, was decided by the New York court of appeals in 1947. The force of that decision has been weakened by the case of *Bohlinger v. National Cash Register Co.,* 305 N. Y. 539, 114 N. E. (2d) 31, decided by the same court in 1953. In the *Bohlinger* case, it appeared that the union and the employer had entered into an arbitration agreement. The employer discharged two employees who were members of the union without notice or show of good cause; asserting its common-law right to discharge at will. Although nothing in the contract dealt specifically with the matter, the court held that the dispute was an arbitrable matter in view of the *all-inclusive language* of the arbitration clause, saying:

"We need not resolve that dispute as to how the collective bargaining agreement should be construed because its mere statement demonstrates conclusively that under the broad language of the arbitration clause, the opposing contentions of the parties ought to be resolved by the arbitrators in respect of its interpretation."

The language of the arbitration clause before us in the instant case is also broad in scope. The parties agree, (1) that they will "meet and treat" or negotiate "on all questions relating to the interpretation or application of the provisions of this agreement," and (2) that they will submit to arbitration "any differences" that "arise between them which cannot be mutually adjusted." In other words, by agreement, there are only two methods to settle disputes, (1) negotiation, and (2) arbitration. Where union and employer, in very clear language, have by agreement chosen an arbitration board as the ultimate forum for the resolution of disputes, there is a very real question as to whether the courts should impose upon the parties the burden of

showing in court or in a judicial forum that a dispute is bona fide as a condition to the right of either party to submit the matter to arbitration. In deciding whether a dispute is bona fide, as was done in the *Cutler-Hammer* case, *supra,* there is the danger that a court, because of a very liberal or a mistaken impression of its function, may, for practical purposes, become the forum for the determination of the dispute. Anything less than a cautious application of the rule would permit a party to an arbitration agreement to choose between a judicial forum and an arbitration forum for the  settlement of a controversy, notwithstanding his solemn agreement in writing to submit all disputes to arbitration.

■ In rejecting Greyhound's contention for application of the rule of the *Cutler-Hammer* case, *supra,* we place our decision disposing of this appeal on this further ground: The language of the arbitration clause in this case is sufficiently broad to require the submission of all disputes involving an interpretation or application of the collective bargaining contract to arbitration. It follows that the trial court arrived at the correct end result, certainly in so far as the declaratory relief requested by Greyhound was denied. We hasten to note that in reaching this result we are not deciding the initial controversy between the parties—as to whether Greyhound or the Union is right. It is not for us to decide this question. Its decision is a matter for the arbitrators.

■ Before concluding, we must note that this appeal presents some significant questions of trial procedure because of the action of the trial court in sustaining the Union's demurrer and in *dismissing* Greyhound's complaint *with prejudice.* It has been said on good authority that a declaratory judgment action is a legal innovation, having some significant and unique aspects, to say the least. When such an action is initiated, it is not solely a question of whether the complaint of the plaintiff entitled that party to the declaration of relief requested by the complaint. The inquiry of the trial court should be whether *either* (a) the plaintiff (who, technically, initiated the action) or (b) the

defendant (who, technically, in a sense may be defending the action) is entitled to a declaration of relief.

In *Cabell v. Cottage Grove,* 170 Ore. 256, 130 P. (2d) 1013, 144 A. L. R. 286, referring to a declaratory judgment proceeding, the supreme court of Oregon stated:

"The test of sufficiency of such a complaint is not whether it shows that the plaintiff is entitled to a declaration of rights in accordance with his theory, but whether he is entitled to a declaration of rights at all. Even though the plaintiff is on the wrong side of the controversy, if he states the existence of a controversy which should be settled by the court under the Declaratory Judgment Law, he has stated a cause of suit."

In *Maguire v. Hibernia Savings & Loan Soc.,* 23 Cal. (2d) 719, 146 P. (2d) 673, 151 A. L. R. 1062, the supreme court of California stated:

"The purpose of a declaratory judgment is 'to serve some practical end in quieting or stabilizing an uncertain or disputed jural relation.' (*New York Foreign Trade Z. Operators v. State Liquor A.,* 285 N. Y. 272 [34 N. E. 2d 316, 319]; cf. *Hess v. Country Club Park,* 213 Cal. 613, 616 [2 P. 2d 782]; *Jackson v. Lacy,* 37 Cal. App. 2d 551, 561 [100 P. 2d 313]; Borchard, Declaratory Judgments, pp. 279 et seq., 984; Anderson, Declaratory Judgments, p. 11.) To hold that a plaintiff on the wrong side of a controversy is not entitled to the security and relief against uncertainty which a declaratory judgment affords would require us to read into the statute a limitation not there present. Section 1060 of the Code of Civil Procedure provides that a party may bring an action for 'a declaration of his rights and duties in the premises' and that the 'declaration may be either affirmative or negative in form and effect.' It contains no suggestion that the pleader must allege facts entitling him to a favorable declaration. (*Cf. Zimmer v. Gorelnik,* 42 Cal. App. 2d 440, 448 [109 P. 2d 34]; *Bank of America v. Gillett,* 36 Cal. App. 2d 453, 455 [97 P. 2d 875]; *In re San Joaquin L. & P. Corp.,* 52 Cal. App. 2d 814, 825 [127 P. 2d 29].)"

This case is before us on appeal as a declaratory judgment action. We have heretofore indicated that, from our examination of the matter, we do not think Greyhound was entitled to the declaration of relief requested. The judgment

of the trial court dismissing the action with prejudice on the ground that Greyhound's complaint was insufficient to state a cause of action did not constitute an adequate disposition of the case under the declaratory judgment act. The matter would still be incomplete from the standpoint of a declaratory judgment if we affirmed the trial court without some instruction as to how the judgment should be modified. A judgment negating Greyhound's right and affirmatively declaring the Union's rights should have been entered.

The judgment of the trial court is affirmed in so far as it negatived Greyhound's claim to a declaration of rights in its favor as the party plaintiff which initiated the lawsuit for declaratory relief. However, the case is remanded so that the judgment may be modified to constitute a declaration of the rights of the Union in accordance with the views expressed herein. Since we are in effect sustaining the end result reached by the trial court, the respondents are allowed their costs on this appeal.

ALL CONCUR.