**LOCAL NO. 149 OF The AMERICAN FEDERATION OF TECHNICAL ENGINEERS (AFL), Plaintiff, Appellant,**

v.

**GENERAL ELECTRIC COMPANY, Defendant, Appellee.**

**No. 5201.**

United States Court of Appeals
First Circuit.

Heard Oct. 3, 1957.

Decided Dec. 16, 1957.

Arthur J. Flamm, Boston, Mass., with whom Robert M. Segal, Boston, Mass., was on brief, for appellant.

Warren F. Farr, Boston, Mass., with whom A. Lane McGovern and Ropes, Gray, Best, Coolidge & Rugg, Boston, Mass., were on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

We have been much perplexed by this case, involving § 301(a) of the Labor Management Relations Act of 1947 (61 Stat. 156), 29 U.S.C.A. § 185(a).

Appellant Union filed a petition under the United States Arbitration Act, as amended (43 Stat. 883, 61 Stat. 669, 68 Stat. 1233, 9 U.S.C.A. § 1 et seq.), and under § 301 of the Labor Management Relations Act (61 Stat. 156), seeking a decree of specific performance to compel

the employer to perform an agreement to arbitrate, as provided in a collective bargaining agreement executed on November 1, 1955, to be operative for a term of five years, with an automatic renewal provision thereafter from year to year.

An understanding of the controversy here requires an examination of several articles of the collective bargaining agreement.

Article VII, entitled "Wage Rates," contains the following provisions:

" *     *     *     *     *     *

"2. Job classifications, job rates and step rates are as shown on Exhibit 'B'.

" *     *     *     *     *     *

"4. When an employee is hired or transferred through the Company Personnel Department and assigned to a job within the bargaining unit, he will be given a card showing his job classification, starting rate, job rate, and rate of progression, if any, applicable to the job for which he is hired or to which transferred. In addition, the employee's new supervisor will explain the general scope of his duties and responsibilities on the new job. Similarly, the employee will be given such information when re-assigned to another job within the bargaining unit.

"5. (a) Rates paid will be on steps. Job rates will be designated by grade.

"(b) The minimum starting rate for an inexperienced employee will be three steps below the Grade 9 job rate.

"(c) Employees will progress on steps, from the starting rate to the Grade 9 job rate, as follows:

> 6 months after hiring—increase one step
> After each additional 6 months—increase one step

"(d) An employee who is receiving the Grade 9 job rate and is assigned to a Grade 11 job, or higher, will be given a one step increase at the end of 6 months dating from assignment to such Grade 11 or higher job.

"(e) Any further increase in rate, up to the job rate for his job, shall be based solely on the employee's performance on the job.

"(f) Subject to the foregoing provisions of this Section 5, the job rate shall be paid for normal performance.

"Exhibit 'B'

"*Job Rates and Progressive Step Rates*

| "Grade | 8–15–55 | 9–15–56 | 9–15–57 | 9–15–58 | 9–15–59 |
|---|---|---|---|---|---|
| 14 | $130.13 | $134.03 | $138.05 | $142.85 | $147.79 |
| 13 | 120.27 | 123.88 | 127.60 | 132.03 | 136.60 |
| 12 | 110.93 | 114.25 | 117.68 | 121.77 | 125.99 |
| 11 | 102.58 | 105.65 | 108.82 | 112.61 | 116.50 |
| 10 | 93.56 | 96.37 | 99.26 | 102.71 | 106.27 |
| 9 | 86.55 | 89.15 | 91.82 | 95.01 | 98.30 |
| | 79.78 | 82.17 | 84.63 | 87.58 | 90.61 |
| | 74.99 | 77.24 | 79.56 | 82.32 | 85.17 |
| | 70.92 | 73.04 | 75.23 | 77.85 | 80.54" |

It will be observed that this so-called Exhibit "B" in Art. VII contains no detailed job specifications setting forth the types of duties falling into grades 14, 13, etc. There is no language in the collective bargaining agreement to be interpreted and applied for the purpose of determining whether the duties performed by a particular employee entitle him to be classified in any particular

"grade," carrying with it a corresponding wage rate.

Article XIV, entitled "Grievance Procedure," established a conventional three-step procedure for adjustment of employee grievances between the Union and the Company, by which negotiation was to continue at progressively higher levels if an agreement was not reached.

Article XV, entitled "Arbitration," read in full as follows:

"1. Any grievance which involves the interpretation or application of this Agreement, and which remains unsettled after having been fully processed pursuant to the provisions of Article XIV shall be submitted to arbitration upon request of either the Union or the Company provided such request is made within 90 days after the decision of the Company has been given to the Union pursuant to Article XIV. In each case, the arbitrator shall be selected and the arbitration proceeding conducted pursuant to procedures mutually satisfactory to the Company and the Union.

"2. The award of an arbitrator so selected upon any grievance so submitted to him shall be final and binding upon all parties to this Agreement. The arbitrator shall have no authority to add to, detract from, or in any way alter the provisions of this Agreement. In addition, it is specifically agreed that no arbitrator shall have the authority to establish a wage rate or job classification, or authority to enter an award pertaining to Article XIX, and that no provision of this Agreement or other agreements between the parties shall be subject to arbitration pertaining in any way to the establishment, administration, interpretation or application of Insurance or Pension Plans in which employees covered by this Agreement are eligible to participate."

Article XXVI, entitled "Management Authority," contains provisions which might perhaps be deemed to have added little or nothing to what would otherwise be implied from the other terms of the collective bargaining agreement. The article is as follows:

"Subject only to any express limitations provided in this Agreement or in any other written agreement between the Company and the Union, the Company retains the exclusive right to manage its business including (but not limited to) the right to determine the methods and means by which its operations are to be carried on, to direct the work force and to conduct its operations in a safe and effective manner.

"This Article does not modify or limit the rights of the parties or of the employees under any other provisions of this Agreement or under any other written agreement between the Company and the Union, nor will it operate to deprive employees of any wage or other benefits to which they have been or will become entitled by virtue of an existing or future written agreement between the Company and the Union. Neither will this Article be used to limit or modify the rights of the Union to process grievances pursuant to Article XIV."

The petition filed by the Union in the present case, after numerous formal allegations, set forth the following:

"On or about November 7, 1955, the Union filed grievances with the Company alleging that the jobs performed by employees, Paul Nolan, Fred Lang, Robert Tivey and Ashley Corporon were incorrectly graded. The Union alleged that under the grades established by the Company and set forth in Article VII of the contract, the duties performed by these employees came within Grade 13 and that the Company had not properly applied the contract in its payments to said employees."

The petition went on to allege that these grievances had been processed in ac-

cordance with the procedures set forth in Art. XIV of the contract; that after such grievance procedure had been exhausted without coming to any agreement, the Union on April 23, 1956, requested the Company to proceed with an arbitration pursuant to § 1 of Art. XV of the contract; that the Company on May 1, 1956, notified the Union that it would not submit said grievances to arbitration and had continually thereafter adhered to its refusal to arbitrate; that the Company's refusal to arbitrate, as aforesaid, "was and is a violation and breach of the collective bargaining agreement between the Union and the Company."

The prayer of the petition was that the Company "be specifically ordered to perform its agreement to arbitrate by submitting to arbitration the grievances involving Paul Nolan, Fred Lang, Robert Tivey and Ashley Corporon."

The district court, on December 3, 1956, after a hearing entered a judgment dismissing the petition for an order to compel arbitration.

In an accompanying memorandum the district court, referring to the provision in § 2 of Art. XV, said the following:

"It seems to me that the condition in this Section, 'It is specifically agreed that no arbitrator shall have the authority to establish a wage rate or job classification * * *,' places a distinct limitation upon the arbitrator that covers the situation in hand.

"Apparently the jobs performed by the employees in question were newly created jobs, and since the contract makes no provision for the Union to be heard on the question of such grading, it seems to me that the question of grading these positions is not open to arbitration.

"From the foregoing I conclude and rule that the petition for an order to compel arbitration must be and is dismissed."

On this appeal by the Union from the judgment dismissing its petition, we are constrained to affirm the judgment of the district court.

We are aware of a viewpoint urged in responsible quarters that the interests of effective labor arbitration would best be served by committing to the arbitrator in the first instance the question of arbitrability, that is, the question whether there is any issue to be arbitrated under the collective bargaining agreement. It is said that a collective bargaining contract is a very special type of document, in respect of interpretation, as to which an arbitrator has certain advantages over a court; that a collective bargaining agreement, though embracing a multitude of terms covering numerous employees working at various tasks, cannot be expected to have pin-pointed each of many problems to be dealt with in relations between the management and the union; that the contract instead contains unexpressed assumptions that many procedures and practices will continue; that under the more simplified and speedy procedures of an arbitration, more evidence with regard to these unexpressed assumptions may be available, and an arbitrator may have the additional advantage of background knowledge derived from past experiences with the parties. Therefore it may be desirable in the first instance to have an arbitrator pass on the threshold question of arbitrability, instead of running the possible risk that a court, in the guise of ruling on this preliminary question of the jurisdiction of the arbitrator, may in effect make a ruling upon the merits of the asserted grievance. See Summers, "Judicial Review of Labor Arbitration or Alice Through the Looking Glass," 2 Buffalo L.Rev. 1 (1952); Cox, "Some Lawyers' Problems in Grievance Arbitration," 40 Minn.L.Rev. 41 (1955); Clifton, "Arbitration and Arbitrability," 3d Annual Conference on Labor N.Y.U. 187 (1950). See also Greyhound Corp. v. Division 1384 of Amalgamated Association of Street, etc., Employees of America, 1954, 44 Wash.2d 808, 271 P.2d 689. See also an address by Professor Cox at the University of Cincinnati Conference on La-

bor Arbitration, November 14, 1957, entitled "Current Problems in the Law of Grievance Arbitration."

While not ignoring the force of these considerations, it seems to us that they would be persuasive not so much in a case like the present, but rather in inducing the parties to make a voluntary submission to arbitration, and in inducing the parties to include terms in a collective bargaining agreement giving wide scope to the questions to be submitted to arbitration.

■ But when one of the parties needs the aid of a court, and asks the court for a decree ordering specific performance of a contract to arbitrate, we think that the court, before rendering such a decree, has the inescapable obligation to determine as a preliminary matter that the defendant has contracted to refer such issue to arbitration, and has broken this promise. The petitioning Union in the present case has indeed recognized this necessity, for the petition alleges that the refusal of the defendant Company to submit the stated grievance to arbitration constituted a breach of the Company's contract to arbitrate as contained in Art. XV of the collective bargaining agreement.

In our elaborate opinion in Local 205, etc. v. General Electric Co., 1 Cir., 1956, 233 F.2d 85, 101, we dealt with the foregoing matter as follows:

"Arbitrability is a question which the district court must pass on in the first instance. By way of guidance, it may be appropriate to note here a brief comment on some general principles. The scope of an arbitration pledge is solely for the parties to set, and thus the determination of whether a particular dispute is arbitrable is a problem of contract interpretation. * * * However, an arbitration clause, either expressly or by broadly stating its scope to include disputed interpretations of any contract term, may refer the very question of arbitrability to the arbitrator for decision. That is, just as a court has jurisdiction to determine its own jurisdiction, the arbitrator in such a case has power to interpret the scope of the arbitration terms of the contract, including questions of whether the dispute at issue is made arbitrable therein and whether the applicant has satisfied the contract procedures prerequisite to arbitration. * * * Thus the district court must first determine whether the contract in suit puts matters of arbitrability to the arbitrator or leaves them for decision by the court. If it is the latter, the court must decide such points before it can give relief under §§ 3 or 4 of the Arbitration Act. If it is the former, and the applicant's claim of arbitrability is not frivolous or patently baseless, an order can be given, with the decision on arbitrability to be made in the arbitration proceedings that follow, subject of course to §§ 10–11 of the Act."

See to the same effect Davenport v. Procter & Gamble Mfg. Co., 2 Cir., 1957, 241 F.2d 511; International Union, United Automobile Aircraft, etc. v. Benton Harbor Malleable Industries, 6 Cir., 1957, 242 F.2d 536; "Matters arbitrable under arbitration provisions of collective labor contract," 1952, 24 A.L.R.2d 752, 766.

■■ What we said in Local 205, etc. v. General Electric Co., supra, was stated on the assumption that the provisions of the United States Arbitration Act were applicable to an agreement to arbitrate contained in a collective bargaining agreement. If that assumption is correct, it is pretty clear from the provisions of § 3 and § 4 of the Arbitration Act (61 Stat. 670–71) that the trial court, as a preliminary to giving the relief therein set forth, must necessarily determine as a matter of law whether there has been any contract agreement to submit the issue in question to an arbitration.

It is true that § 301 of the Labor Management Relations Act of 1947 can no longer be challenged on the score of unconstitutionality. Textile Workers Union of America v. Lincoln Mills of

Alabama, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972; International Brotherhood, etc. v. W. L. Mead, Inc., 1 Cir., 1956, 230 F.2d 576. But despite the fact that the petitioning Union in the case at bar professed to base its petition on the United States Arbitration Act as well as on § 301 of the Labor Management Relations Act of 1947, it may well be that we are not entitled to dispose of the present case by reliance upon any provision in the Arbitration Act. When Local 205, etc. v. General Electric Co. was before this court, we were troubled by "the hoary though probably misguided judgemade reluctance to give full effect to arbitration agreements". 233 F.2d at page 96. We therefore thought we were not justified in reading into the very general language of § 301(a) authority in a federal court to decree specific performance of an agreement to arbitrate unless we could find that the provisions of the United States Arbitration Act, by proper interpretation, were made applicable by the Congress to agreements to arbitrate contained in collective bargaining agreements. We suggested the following "practical grounds" in support of this conclusion:

"A glance at a typical arbitration statute shows that it lays down procedural specifications for use of the new power to compel arbitration. Topics covered may include requisites of a submission, selection of an arbitrator, procedure and subpoena power for the arbitrator, stay and specific enforcement authority in a court, grounds and procedure for confirming or vacating an award. A court decision could overrule the common law bars to specific enforcement, but could not substitute for them the comprehensive and consistent scheme that legislative action could afford, and which is necessary for effective yet safeguarded arbitration." (Ibid.)

And so, after a full consideration of the terms and legislative history of the United States Arbitration Act (233 F.2d at pages 97–101), we came to the conclusion that though the Congress, in enacting the Arbitration Act, undoubtedly was focusing its attention on the field of commercial arbitration, it nevertheless had chosen to enact a statute which was broad enough in terms to apply to collective bargaining agreements.

Our opinion also stated:

"The case will therefore be remanded for further proceedings under the Arbitration Act. Since our decision makes clear for the first time in this circuit that that Act is applicable, the district court should now permit the parties to amend their pleadings so as to allege, respectively, compliance with the requisites of the Act and defenses afforded by it." 233 F.2d at page 101.

Since the district court had dismissed the union's complaint for a decree of specific performance on what we held to be a mistaken view that the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq. forbid the district court to grant the requested decree, we entered a judgment in the case vacating the district court's judgment of dismissal and remanding the case to that court for further proceedings not inconsistent with our opinion.

Certiorari was granted in this and other cases. The main opinion of the Supreme Court was in Textile Workers Union of America v. Lincoln Mills of Alabama, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. In that case, without mentioning the Arbitration Act, the Supreme Court concluded that the general language in § 301 of the Labor Management Relations Act of 1947 was in and of itself sufficient authority to a federal district court to decree specific performance of an agreement to arbitrate. Only a brief opinion was written by the Supreme Court in General Electric Co. v. Local 205, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028, which the Court regarded as a companion case to Textile Workers Union of America v. Lincoln Mills of Alabama. Referring to our opinion in 233 F.2d 85, the Supreme Court said:

"It first held that the Norris-LaGuardia Act did not bar enforcement of the arbitration agreement. It then held that while § 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185(a) gave the District Court jurisdiction of the cause, it supplied no body of substantive law to enforce an arbitration agreement governing grievances. But it found such a basis in the United States Arbitration Act, which it held applicable to these collective bargaining agreements. It accordingly reversed the District Court judgment and remanded the cause to that court for further proceedings.

"We affirm that judgment and remand the cause to the District Court. We follow in part a different path than the Court of Appeals, though we reach the same result. As indicated in our opinion in No. 211, Textile Workers Union of America v. Lincoln Mills of Alabama, supra, we think that § 301(a) furnishes a body of federal substantive law for the enforcement of collective bargaining agreements in industries in commerce or affecting commerce and that the Norris-LaGuardia Act does not bar the issuance of an injunction to enforce the obligation to arbitrate grievance disputes." 353 U.S. 547, at page 548, 77 S.Ct. 921, at page 922.

The Supreme Court sent down to us a certified copy of its judgment in the case, which judgment, under paragraph 3 of Rule 59, Revised Rules of the Supreme Court (346 U.S. 1009), 28 U.S.C.A., served also as the Supreme Court's mandate to the district court. That judgment by the Supreme Court contained the following: "It is now here ordered and adjudged by this Court that the judgment of the said United States Court of Appeals, in this cause, be, and the same is hereby, affirmed; and that this cause be, and the same is hereby, remanded to the United States District Court for the District of Massachusetts."

It may perhaps be surmised that if the Supreme Court had agreed with our analysis as to the applicability of the Arbitration Act, it would have said so, for that conclusion would have rendered the case before the Supreme Court easier to decide. On the other hand, it is possible that the Supreme Court found the proper interpretation of the Arbitration Act a difficult question to decide, which it was justified in side-stepping as unnecessary to the disposition of the case, since, in its view, in any event the broad provisions of § 301(a) of the Labor Management Relations Act of 1947 were sufficient in and of themselves to authorize a federal district court to decree specific performance of an agreement to arbitrate.

The foregoing, of course, is pure speculation on our part. Perhaps it is a speculation in which we ought not to indulge, in the absence of an express ruling by the Supreme Court on the matter. Anyhow, though we are still convinced of the correctness of our ruling as to the applicability of the Arbitration Act, we think that in disposing of the present case we should, as an alternative ground, proceed on the assumption that the provisions of the Arbitration Act are by their terms inapplicable to collective bargaining agreements. We are unable to say whether, on that assumption, in fashioning the federal substantive law to be applied in suits under § 301(a), the Supreme Court would adopt, as a guiding analogy, the provisions of the United States Arbitration Act, as was done by Judge Wyzanski in Textile Workers Union of America (CIO) v. American Thread Co., D.C.D.Mass.1953, 113 F. Supp. 137, at page 142. However that may be, and focusing our attention exclusively on the language of § 301(a), it is obvious that the plaintiff, in a suit under § 301(a), has the burden of establishing that it is bringing a suit for appropriate relief, legal or equitable, for violation of a term of a collective bargaining agreement; and that therefore the district court, before undertaking to decree specific performance of a contract

for arbitration, must necessarily first determine, as a matter of law, whether the alleged refusal to arbitrate is a violation of any term in the collective bargaining agreement. Hence, whether we look to the terms of the Arbitration Act, or whether we look exclusively to the terms of § 301(a), the issue of arbitrability under the collective bargaining agreement is inescapably an issue which the district court must determine for itself as a matter of interpretation of the terms of the arbitration article in the collective bargaining agreement.

We find nothing in the terms of the carefully guarded arbitration agreement here to warrant the conclusion that the employer has agreed to arbitrate the question of the arbitrability of the grievance stated in the petition. We doubt whether the district court should have rested its dismissal upon the provision of § 2 of Art. XV that "it is specifically agreed that no arbitrator shall have the authority to establish a wage rate or job classification". The Union may well be correct in saying that this language, properly interpreted, was limited to forbidding the arbitrator to establish new job grades or wage rates, but was not intended to prevent the arbitrator from applying the established job grades and wage rates to existing jobs.

More fundamentally, what is submitted to arbitration is defined in § 1 of Art. XV as "Any grievance which involves the interpretation or application of this Agreement". As we have previously pointed out in this opinion, there is no language in the collective bargaining agreement to be interpreted and applied for the purpose of determining whether the duties performed by any particular employee entitle him to be classified in any particular grade. The provisions of Art. VII of the present collective bargaining agreement may perhaps be contrasted with the provision of the collective bargaining agreement found in Local 205, etc. v. General Electric Co., supra, which, in Art. IX, contained the following, absent in the present case: "The Company shall furnish the Union, within 30 days after the signing of this Agreement, a complete list of job classifications and rate ranges." Under such an agreement, it may perhaps be argued that once the Company has supplied the Union with a list, as aforesaid, the terms of the job classifications and rate ranges become incorporated in the collective bargaining agreement by reference, and become binding on the Company, so that a dispute regarding whether the duties performed by a particular employee fall within the job description of the particular grade relates to "the application or interpretation of any provisions of this Agreement", the type of grievance which the Company agreed to arbitrate in Art. XIII of that collective bargaining agreement. In the case at bar, the collective bargaining agreement contains absolutely no language by way of job descriptions which could be interpreted or applied for the purpose of determining whether the duties performed by a particular employee fall within any particular grade.

A judgment will be entered affirming the judgment of the District Court.