**UNDERWOOD CORPORATION,**
Plaintiff,

v.

**LOCAL 267, INTERNATIONAL UNION OF ELECTRICAL, RADIO & MACHINE WORKERS, AFL-CIO,** Defendant.

**Civ. No. 6634.**

United States District Court
D. Connecticut.
April 28, 1960.

Austin K. Wolf and Robert Ashkins, of Cohen, Schine & Wolf, Bridgeport, Conn., for plaintiff.

James McConnell Harkless, of Grant, Angoff, Goldman & Manning, Boston, Mass., for defendant.

CLARK, Circuit Judge (sitting as District Judge pursuant to statutory designation).

The plaintiff employer commenced this action to stay the enforcement of and to vacate an arbitrator's award in the Connecticut Superior Court under Conn.Gen.

Stat. § 8151 (1949). The defendant union removed the action to this court, asserting jurisdiction under § 301 of the National Labor Relations Act, 29 U.S.C. § 185(a). The court has denied a motion to remand for lack of federal jurisdiction, D.C.Conn., 171 F.Supp. 102—a ruling whose propriety was confirmed by the subsequent decision in Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. The complaint is considered as seeking a declaratory judgment, 28 U.S.C. § 2201, as to the arbitrability under a collective bargaining agreement of a labor dispute between the parties. While the hearing below was initially directed to a motion by the defendant for a stay of the action, the parties stipulated that the hearing should be upon the merits and evidence was taken upon a full submission of the case. No difficulty is perceived in the fact that a formal cross-motion to compel arbitration was not advanced. Compare New Bedford Defense Products Division of Firestone Tire & Rubber Co. v. Local No. 1113 of Intern. Union, United Auto. Aircraft and Agr. Implement Workers of America (UAW, AFL-CIO), D.C. Mass., 160 F.Supp. 103, affirmed 1 Cir., 258 F.2d 522. If full jurisdiction on the merits were not now accepted, the employer to secure adjudication would need only to refuse to proceed with arbitration, and the parties would necessarily be back before the court, albeit in a reverse posture.

The underlying dispute involves the employer's change in the screw-machine cycle time for manufacturing certain parts from twenty to ten seconds, with an attendant reduction in the operator's piecework price or rate. The reduction in cutting time was the result of a change in gearing which the employer believed to be consonant with quality results. The collective bargaining agreement of January 14, 1955, then in force between the parties, Exhibit A herein, provided a grievance and an arbitration procedure for the settlement of controversies. The grievance procedure had three "steps": a presentation to the department foreman for his decision, then a decision by the divisional superior, and then an appeal to and decision by the Personnel Manager. Here the union, after exhausting the grievance procedure, filed a demand for arbitration. The employer denied that the grievance was arbitrable, but eventually entered into a stipulation with the union, Exhibit C, for a limited submission to obtain an "interim" ruling on three issues: the timeliness of the grievance; the withdrawal of the grievance from arbitration; and the arbitrability of the grievance. Then under the prescribed arbitration procedure the American Arbitration Association appointed an arbitrator, who heard proofs and rendered a reasoned decision, Exhibit E, finding against the employer on each of the three issues. Thereupon the employer instituted this action and the union moved to stay it as premature until the arbitrator had ruled on the merits of the grievance. With the parties' stipulation at the court's suggestion that the case be considered as presented in all aspects, we shall proceed to decision.

In support of the preliminary motion for a stay it is asserted that suit at this time is analogous to an interlocutory appeal and that the court should decline to exercise its jurisdiction until arbitration has been completed. For this contention it might be argued that the parties should be compelled to complete their private settlement proceedings and then this action might be rendered moot by a decision favorable to the employer on the merits of the grievance. Further, judicial determination at this stage subjects the parties to the burden of a double submission before the arbitrator. Nevertheless it seems now to be settled that the employer might have raised the question of arbitrability prior to any submission. Local 205, United Elec., Radio and Mach. Workers of America (UE) v. General Elec. Co., 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028, affirming 1 Cir., 233 F.2d 85; Engineers Ass'n v. Sperry Gyroscope Co., 2 Cir., 251 F.2d 133, certiorari denied 356 U.S. 932, 78

S.Ct. 774, 2 L.Ed.2d 762; Local No. 149 of American Federation of Technical Engineers (AFL) v. General Elec. Co., 1 Cir., 250 F.2d 922, certiorari denied 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813. See also Barrett v. Miller, 2 Cir., 276 F.2d 429, and Mahoney v. Fisher, 2 Cir., 277 F.2d 5.

So the courts have refused to compel arbitration without determining whether the particular grievance was within the scope of the parties' arbitration agreement, notwithstanding contrary suggestions advanced by many commentators. These suggestions are grounded upon the belief that the courts by determining arbitrability in the first instance are deprived of the advantage of the arbitrator's greater familiarity with the unique problems involved in the interpretation of collective bargaining agreements and of his background knowledge of the particular contract, parties, and industry in question. See Local No. 149 of American Federation of Technical Engineers (AFL) v. General Elec. Co., supra, 1 Cir., 250 F.2d 922, 926–927, certiorari denied 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813. However persuasive this rationale may be, it obviously loses much of its force where, as here, a party seeks judicial protection at an intermediate stage of the arbitration proceeding. Consideration of the issue of arbitrability in its present posture thus appears preferable to initial judicial determination. Either party may avoid such intermediate judicial intervention in the arbitral process by refusing to agree to a partial submission on the issue of arbitrability. When that has been had, by agreement, then judicial adjudication appears appropriate and in any event must be given under the precedents cited.

Alternatively, it is asserted that the parties intended the arbitrator's ruling on arbitrability to be final and binding, and that the employer agreed to proceed to the merits of the grievance if it were found to be arbitrable. The stipulation of submission, however, states merely that the arbitrator "will render an interim ruling on the following issues raised by the Company * * *." Neither this document nor the fact of submission supports the inference suggested by the union, especially in view of the acknowledgment that the arbitration clause does not render the arbitrator's determination on the issue of arbitrability final and binding.[1] The only testimony on this question adduced at the trial was that of Mr. Kaye, the employer's plant personnel director at the time of the grievance and arbitration herein involved. This evidence, which the court finds credible, negates the suggestion that the employer, in agreeing to a partial submission, relinquished its right to judicial determination of these issues or agreed to proceed with a total

---

1. Sec. 5(g) of the contract, Exhibit A, provided:

"(g) No grievance arising under Sections 6 and 15 hereof, and no grievances excluded from arbitration by any other provision of this agreement, may be taken beyond Step 3, and no such grievance may go to arbitration.

"All other grievances by the Union, not settled at Step 3, arising under this agreement concerning the interpretation or application thereof, shall be submitted to arbitration * * *. A decision by the arbitrator shall be final and binding upon all parties. * * *

* * * * *

"The arbitrator shall be limited to ruling on the interpretation or the application of the terms of this agreement and shall have no power to add to, subtract from, or modify any of the terms of this agreement."

Similar provisions have been uniformly held to reserve to the parties the right to judicial determination of arbitrability. See, e. g., Engineers Ass'n v. Sperry Gyroscope Co., 2 Cir., 251 F.2d 133, certiorari denied 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762; Local No. 149 of American Federation of Technical Engineers (AFL) v. General Elec. Co., 1 Cir., 250 F.2d 922, certiorari denied 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813; Refinery Emp. Union of Lake Charles Area v. Continental Oil Co., 5 Cir., 268 F.2d 447; International Union, United Auto., Aircraft, etc. v. Benton Harbor Malleable Industries, 6 Cir., 242 F.2d 536, certiorari denied 355 U.S. 814, 78 S.Ct. 15, 2 L.Ed.2d 31.

submission before seeking judicial relief. Evidently a partial submission was agreed upon because the employer felt confident of prevailing therein, while the union preferred that arbitrability initially be determined by an arbitrator, rather than by a court.

Accepting therefore the conclusion that the merits of the dispute are now before the court for adjudication, it is desirable at the outset to note how the parties framed the issue. This appears from Exhibit B, the "Grievance Record." From this it appears that Employee #5060, Wm. Johnston, on January 16, 1956, presented to his foreman a grievance thus described:

"*Nature of Grievance* Part Nos. XT–3, XT–4, & XT–5.

"The time on the above jobs was established in Nov. 1933, at 20 seconds.

"In Dec. 1955 the cycle time was changed to 10 seconds and the rates were reduced accordingly.

"The operator is protesting this reduction in time and price as a violation of Section 16—Paragraph (H) in the contract."

Next appears "Step Two, Decision by Divisional Supervisor," on January 24, 1956, as follows:

"Supervisory employees are charged with the responsibility of getting ultimate output from any and all equipment. Whenever it is discovered that it is possible to decrease cutting times and still end up with quality results, the company feels that it is justified in retiming.

"The change in rates on the jobs noted in this grievance results from changes in gearing. In the opinion of management this constitutes a change in method inasmuch as gear changes alter cycle times and therefore rates."

Then we have "Decision Appealed to Third Step," January 25, 1956, with "Additional Comments by Union" thus:

"In this case the rate was not being grieved. The grievance per-

tained to the procedure the Corp. used in handling a grieved job plus the fact that we do not consider this practice a new method of operation."

And finally we have "Step Three, Decision of Personnel Director and/or His Representative," on March 7, 1956, thus:

"This is a grievance in which employee William Johnston has protested the change in the cycle time on Part Nos. XT–3, XT–4, and XT–5, with a resulted reduction in rate.

"This grievance was discussed in the Grievance Committee meeting of 2–10–56. At that time it was established that the change in rate on the grieved jobs was due to changes in gearing which resulted in lower cycles. In this case, the cycling was changed from 20 seconds to 10 seconds. The union maintained that a change in gearing was not a methods change according to the provisions of Section 16(h) of the contract.

"One of the fundamentals in establishing rates in the Screw Machine Department, is the cycle time. When the cycle time is changed, for any reason including that mentioned in the second step answer, the company considers this a methods change and as such can change the production standards as cited in section 16(h)."

■ Since the decisive question here is whether the grievance is arbitrable in view of the broad exclusion (hereinafter discussed) of wage issues from the arbitration process, it is desirable to define the question as precisely as we can. There is no conflict, however, as to what took place in this change of cycle time; it is brought out clearly in Kaye's testimony, and nowhere questioned. He stated that the acceleration in the timing of the "speeds and feeds with which automatic screw machines were operated" came as a result of a "time and motion study" conducted to enable the setting of an appropriate rate, and that the acceleration of the machines "caused in-

creased productivity and the workers or operators relatively remained the same." He also testified that the operator's piecework rate on the machine was reduced as a result of the retiming. Indeed all this would necessarily follow from the operation of the wage provisions of Section 16 of the collective bargaining agreement, Exhibit A. These established an hourly rate schedule for twelve labor grades from which the piece rate or price was determined by dividing the agreed-upon hourly amount by the hourly production standard. Cutting the cycle time in half would increase (perhaps double) the number of pieces produced per hour and thus reduce the piecework rate. But the operator's total earnings might not vary to any substantial degree, and that appears to be Kaye's testimony. At any rate no point or claim is made as to this. The real stake would appear to be the company's increased earnings, due to the increased productivity of the machines.

So we must turn to the collective bargaining agreement, Exhibit A, to ascertain if this asserted grievance is arbitrable. The union has described the grievance as a change in cycle time in violation of § 16(h) of the contract, which provides:

> "(h) Production standards on piece work operations once established as permanent shall not be changed unless the design, (a new or modified part), tooling, material, method of operation or process is changed, or unless an arithmetical error has been made in the computation of the standard."

This appears in a lengthy section with many subdivisions, entitled "Section 16. Wages." There is no dispute that the change in gearing, and thus in cycle time, constitutes a modification of a production standard; but the employer considers such alteration to be a methods change, authorized by § 16(h), while the union takes the contrary position. Thus the grievance turns upon the interpretation of the phrase "method of operation," as contained in § 16(h).

The employer, however, asserts that arbitration of the grievance as thus characterized is patently precluded by § 16(m), which reads:

> "(m) There may not go beyond Step 3 of the grievance procedure to arbitration any difference or grievance as to interpretation or application of or arising under any provision of Section 16 (Wages) or Exhibit A referred to therein or relating to or affecting the earnings or any rate of the employee, except whether under the Corporation's job evaluation plan, job descriptions, data sheets, and labor grading as accepted by the Union under Section 16:  *  *  * ".

There then follow five detailed exceptions, no one of which is claimed to be here applicable. They do have, however, some significance as an aid to interpretation, and hence are discussed below from that point of view.

At the trial the parties did not offer any evidence of the circumstances surrounding the negotiations and adoption of § 16(m), which would indicate their purpose in adopting the section, aside from that suggested by the terms of the agreement. Nor does the arbitrator's opinion refer to any such testimony. The court is thus limited to the language of the contract, which, however, does not appear to permit of any doubt of the general intent of the parties not to allow earnings or wage rates of employees to be determined or affected by an arbitrator's decision, except in the specifically defined situations carefully noted in the subdivision. Since the grievance concededly arises under a provision of § 16, entitled "Wages," which is expressly excluded, and since, moreover, cycle time is a basic component of wage determination affecting the rate of the employee, arbitration of the grievance is foreclosed by the express terms of § 16 (m).

This conclusion, which is decisive of the case, seems to the court the only one reasonable under the circumstances of the parties and the wording of their con-

tract. In fact, whatever hesitancy the court might feel in decision comes entirely from the arbitrator's contrary conclusion, which, however, as noted below, does seem to be based on a strained interpretation ignoring some of the contract provisions. The arbitrator, now deceased, was a person of recognized standing (as is the case with AAA arbitrators generally), a professor at the Wharton School of Finance and Commerce of the University of Pennsylvania with experience in the labor field. But he expressed a degree of compulsion to find a fully integrated agreement for complete arbitration so far as possible, which would be sound enough had the parties themselves not stated an exception therefrom as to wages, which cannot be limited, as he urged, without doing violence to the natural meaning of the words. It is quite clear that the parties wished to keep all questions of employee earnings, beyond a few specified exceptions, for the process of negotiation and bargaining, rather than submit them to adjudication from outside. That is the explicit prohibition of § 16 (m), which excludes from arbitration not only all differences in interpretation under any provision of § 16, the "Wages" section, but also any difference under any provision relating to or affecting the *earnings* or *any rate* of any employee unless expressly stated. And the conclusion implicit in this broadly stated exclusion is borne out by other pertinent provisions of the contract.

In this connection the exceptions are also significant. There seems no reason for stating the five lengthy exceptions to § 16(m) if they are already excluded by according a limited meaning to "Wages." Thus under these express exceptions the arbitrator may assign the appropriate job title to a day worker most nearly fitting his actual duties, but cannot create new job titles or place a job title in a different labor grade; and so also as to job title assigned to "an incentive operation"; and so in the case of a new job description, whether it fully and accurately reflects the actual duties of the job; and so as to grievances (subject to some limitations) of an employee who is not earning the expected incentive earnings for the labor grade of his operation; and so as to whether the employer has fulfilled its obligations under § 16(c) and (g) to make periodic reviews in respect to day workers and incentive workers within the time limits fixed by those provisions. And there are other provisions rather too numerous to catalogue looking the same way and supporting the general prohibition against arbitration of wage disputes. Thus in § 16(b) the employer's present job evaluation plan marked "Exhibit A" is accepted, but there is set up in § 16(d) in obvious stead of arbitration a committee of two employer and two union representatives to consider any question as to the correct labor grading of a job title established for day-work employees or as to the correctness of description of such jobs.

It is to be noted that the wage rates thus established by contract would not be indefinitely frozen. For the duration of the contract was expressly set in § 18(a) at a little less than 20 months, with a little less than 8 months remaining at the time of this grievance. Thus the wage schedules could be renegotiated on the making of a new agreement, as actually happened in the new agreement of October 17, 1956, Exhibit D. Moreover, § 18(b) of Exhibit A contained provisions for the earlier reopening of the wage schedules on notice. True, the union here is not directly attacking the wage schedules. Rather by asking arbitration to confirm its interpretation of § 16(h), it is seeking to preserve the status quo; but since increased productivity can hardly be rejected out of hand, that would seem inevitably to lead to renegotiation.

The arbitrator reached a contrary conclusion by focusing on the phrase "relating to or affecting the earnings or any rate of any employee," and reasoning that it is merely redundant if all provisions of § 16 are nonarbitrable. In effect, the disjunctive "or" is read as the

conjunctive "and," so that only those provisions of § 16 which relate to or affect earnings or rates are outside the scope of arbitration. It seems more reasonable to the court, however, to interpret the phrase as strengthening rather than weakening the proscription of arbitration of § 16 grievances. Further, the arbitrator's construction does not dispose of the question, since it is common ground that the change in cycle time resulted in a reduction in the operator's piecework price or rate. It thus seems clear that the grievance affected wage rates. To avoid this result the arbitrator seemingly interpreted the phrase as requiring that rates be "directly" affected and concluded that the change in cycle time has only an indirect effect. This reasoning likewise appears unjustified; the contract language is too inclusive to brook of such a definition.

The arbitrator also held that the union had withdrawn any issue as to rates by its statement in its third step in the grievance procedure that "[i]n this case the rate was not being grieved." Exhibit B, quoted supra. But this does not seem a correct appraisal of what the union was doing. It was not shifting position, but only reiterating its attack on the change of cycle having a resulting effect on piecework production and the payment thereof. And a redefinition by one of the parties cannot really change the nature of the issue which has been so clearly defined in process as indicated above, and pressed upon the court here.

Another rationale advanced by the arbitrator as having merely a "secondary or corroborative influence" was of the tenor that, since the union is restrained by the agreement from strikes and work stoppages, a denial of arbitration must be precise and unequivocal. While this canon might well be entitled to weight in the event of ambiguity, this is not a case where the parties have intentionally left the matter vague or have failed to anticipate the problem. It is difficult to envision a more precise and unequivocal foreclosure of arbitration than that contained in § 16(m). It is often suggested that collective bargaining agreements must be framed in general terms so as to be readily understandable to the average employee; but it seems unlikely that anyone but perhaps an attorney would urge that a § 16(h) grievance is arbitrable in the face of the language of § 16(m).

Since the issue here involved seems to the court so clearly excluded from the arbitration process by the terms of the parties' agreement, Exhibit A, it is not thought desirable to indulge in exegesis as to the other two major issues raised by the plaintiff, that of the timeliness of the union's presentation of the grievance under the terms of § 5(b) of the contract and that of the asserted withdrawal of the grievance on the adoption of the new bargaining agreement of October 17, 1956, Exhibit D, under the terms of § 16(r) thereof. These questions do involve somewhat the definition of wages considered above, but they also raise collateral issues not involved in the major question here discussed.

It follows that the plaintiff is entitled to a judgment declaring that the grievance presented by the union is excluded from arbitration by the terms of the agreement between the parties of January 14, 1955, Exhibit A. The clerk is directed to enter judgment forthwith to that effect. There would seem no need to enter an injunction under the present circumstances; of course the parties may always apply for further or other relief as the need appears. This opinion contains the court's findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).