REFINERY EMPLOYEES' UNION of
The LAKE CHARLES AREA

v.

CONTINENTAL OIL COMPANY.
Civ. A. 6419.

United States District Court
W. D. Louisiana,
Lake Charles Division.
April 2, 1958.

1. 1954 U.S.Code Congressional and Administrative News, pp. 3688, 3691, 3692.

George W. Liskow, Lake Charles, La., for plaintiff.

William R. Tete, Lake Charles, La., for defendant.

HUNTER, District Judge.

Petitioner (union) entered into a collective bargaining agreement in 1956 with employer (Continental Oil Company), the agreement to run two years and from year to year thereafter, unless terminated on specific notices. The agreement provided that there would be no strikes, work stoppages, or lock-outs, and that grievances would be handled pursuant to a specified procedure. The last step in the grievance procedure—a step that could be taken by either party —was a request for arbitration in certain instances. The arbitration clause constitutes Section 21–1 of the contract; it reads as follows:

"21–1    Only differences relating to the interpretation or performance of this agreement which cannot be adjusted by mutual agreement, after processing through the grievance procedure may, upon written notice by one party to the other, not later than sixty (60) days after the date of the decision of the regional manager of manufacturing be submitted to arbitration."

"21–2 The party desiring arbitration shall notify the other party of the matter to be arbitrated, and the name of the arbitrator selected by it, within five (5) days after giving such notice. The other party shall appoint an arbitrator and shall within five (5) days notify the first party of such appointment. The two (2) arbitrators so named shall confer within ten (10) days and attempt to reach an agreement. Should they be unable to agree within five (5) days of their first conference a third member shall be selected by these employer and employee representatives. The majority decision of such board of arbitrators so selected shall be rendered within ten (10) days of appointment and shall be binding upon both parties signatory hereto and retroactive to the date upon which the matter for arbitration was first presented in writing to the superintendent of the refinery as outlined under 19–2."

This controversy involves only one grievance and that concerns one specific work assignment on one specific occasion. The grievance was processed through the various steps in the grievance procedure and the union gave the proper notice requesting arbitration. The union requested that the following issue be submitted to the arbitrator:

"Did the company's use of employer LeSueur in connection with overtime on the platforming unit of March 3, 1957, violate Section 8 of the collective bargaining agreement between the company and the union?[1]

The company concedes that the Court may properly order it to proceed forthwith under the provisions of Section 21 of its collective bargaining agreement to hear and determine that question, *"Provided, However, That The Arbitrator's Authority Shall Be Limited To A Determination Of Whether Such Violation Occurred And Shall Not Extend To The Formulation Of Any Penalty Or Other Remedy In The Event Said Question Is Decided In The Affirmative."* [2]

The action is primarily under the provisions of Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185. Relief sought by plaintiff as shown by the prayer is for: a declaration of its rights under Section 21 of the contract; a mandatory injunction to compel defendant to arbitrate certain issues; and relief in the form of what is termed "incidental" damages for failure to arbitrate.

■ It is now clear that Section 301 of the Act confers power upon the Federal District Courts to compel arbitration in accordance with the terms of a collective bargaining agreement. Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 918, 1 L.Ed.2d 972.

■ Defendant asserts that just because the dispute is "grievable", it does

1. "8–1 Work peculiar to a classification shall be performed by employees assigned to that classification, except as otherwise provided for in this agreement, but the Company reserves the right to assign to such work available employees regularly assigned to other classifications when necessary for the efficient operation of the plant, provided that employees from the classification to which such work is regularly assigned are not available."

2. The record reveals that the company sought to settle the grievance by assigning to the allegedly aggrieved four hours overtime work at the equivalent pay and classification. This offer was refused by the union. The union offered to settle the grievance if the company would pay the allegedly aggrieved for the four hours work the equivalent in money therefor as a penalty for the alleged misassignment. This offer of settlement was refused by the company on the grounds that there was nothing in the contract concerning the payment of wages for work not performed. The company further refused to negotiate relating to the remedies for violations of Section 8 because, as they stated, "the arbitrator would have no contractual criteria to follow, and his reward as to remedy would be beyond the terms of the contract."

not necessarily follow that it was also arbitrable and insists that this Court must determine as a matter of law whether there has been any agreement to submit the particular issue in question to arbitration. We agree that this is so. Engineers Ass'n v. Sperry Gyroscope Co., etc., 2 Cir., 1957, 251 F.2d 133, and Local No. 149, etc. v. General Electric Company, 1 Cir., 1957, 250 F.2d 922.

### The Lincoln Mills Case

When the Supreme Court of the United States in Lincoln Mills interpreted Section 301 as authority for federal courts to fashion a body of federal law for the enforcement of collective bargaining agreements, including the specific performance of arbitration provisions of such agreements, it wisely provided guidance for the lower courts as to the sources from which they might garner some of the more important viscera for the body they were charged with molding. There, the Court set out what might be described as sources of creative inspiration for the lower courts:

First, it noted, " * * * the policy of our national labor laws." Because of the pluralization, we assume this means the principal moving purpose underlying all national laws on the subject.

Secondly, it noted specifically that, "The Labor Management Relations Act expressly furnishes some substantive law."

Thirdly, it noted, " * * * the penumbra of express statutory mandates", which we take to mean the shadow cast by statutes not specifically intended to apply to this particular field but having sufficient elasticity to permit extension by analogy, if not by direct application, to cover some facets of the problem at hand.

Fourthly, it noted, " * * * state law, if compatible with the purpose of § 301."

Before leaving Lincoln Mills, supra, to explore these sources, it should be observed that, while the Lincoln Mills case does provide a requisite basis of substantive law for the granting of relief

by courts in actions of this Type, it does not follow that the case itself is sufficient authority for granting the relief sought under the facts of this case, notwithstanding a superficial similarity between the two. The Supreme Court's holding is simply to the effect that Section 301 of the Act affords a substantive basis for the courts to order the parties to a collective bargaining agreement to submit to arbitration Such Issues As They May Have Agreed To Arbitrate in said agreement, and subject to such conditions and rules as may be developed from the sources of law previously mentioned. It does Not hold that there is any basis for requiring arbitration in the absence of such an agreement, Nor Does It Afford Any Basis For Extending Such Agreements To Encompass Any Issue Not Contemplated By The Parties As Within The Scope Of The Arbitration Agreement. Neither the Supreme Court nor the Fifth Circuit, 230 F.2d 81, passed upon the question of whether or not the dispute itself in Lincoln Mills was arbitrable under terms of the contract, and although the District Court (the decision of which is unreported) apparently considered it so, the issue does not appear to have been raised. Moreover, nothing is known about the nature of the dispute or the terms of the agreement except for what is paraphrased in the Fifth Circuit's decision, supra. However, it is obvious from that Court's paraphrased reference to the agreement that the arbitration clause *was much broader in scope than its counterpart in the case at bar, which is probably why the company did not raise the issue.*

Thus, bearing in mind that the only significance of Lincoln Mills is to establish a general basis in substantive law for suits of this nature, we turn to a consideration of the sources to which we have been referred for more specific principles of law.

At least, by implication "the policy of our national labor laws" favors restricting arbitration to matters which the parties have agreed voluntarily to arbitrate. Invariably we find stress placed

upon the voluntary nature of the proceeding as opposed to the principle of compulsory arbitration. In this connection, Volume 5 of Commerce Clearing House, Labor Law Reporter, Fourth Edition, contains the following discussion at page 51,040:

"In discussion and technical study, arbitration can be either voluntary or compulsory. In practice, in the United States, it is overwhelmingly voluntary. It is wholly voluntary on the federal side. There is no federal statute compelling parties to submit their labor disputes to an arbitrator. And this federal avoidance of compulsory arbitration reflects the frequently expressed view of most representatives of both management and labor.

"This emphasis on voluntary arbitration as the desirable and most effective type is reflected strongly in the Taft-Hartley Act (No. 725) [29 U.S.C.A. § 161 et seq.]. Indeed, with wartime exceptions, federal arbitration law has concentrated on voluntary arbitration ever since 1898 when the Erdman Act [30 Stat. 424], providing for voluntary arbitration of railway labor disputes, replaced the compulsory Arbitration Act of October 1, 1888, 25 Stat. 501 —a law that remained a dead-letter during the ten years it was in the statute books. From 1898 on, general federal law has concentrated on voluntary arbitration. Railway labor dispute arbitration has been voluntary under the Erdman Act, under the Newlands Act of 1913 [38 Stat. 103], under the Transportation Act of 1920 [49 U.S.C.A. § 1 et seq.], and under the present Railway Labor Act [45 U.S.C.A. § 151 et seq.]. The same emphasis on voluntary agreement marked the labor dispute adjustment agencies of the Depression years—the industrial Boards of Adjustment that were set up by Presidential executive orders in many industries under the authority of Public Resolution 44 of the Seventy-third Congress [48 Stat. 1183].

"Compulsory, forced arbitration has been resorted to only in emergency wartime conditions—in the Adamson Act of 1916 [45 U.S.C.A. §§ 65, 66] which set up compulsory arbitration of railway labor disputes, and in the jurisdiction of the National War Labor Board during World War II. (Compulsory powers of this now-defunct Board stemmed from Presidential executive order—E. O. 9017 of January 12, 1942, 7 F.R. 237 [U.S.Code Cong.Service, 1942, p. 47]—and from the War Labor Disputes Act of June 25, 1943, 57 Stat. 163, Pub. L. 89, 78th Cong., 1st Sess. [50 U.S. C.A. Appendix, §§ 1501–1511].)"

In this same connection, the National Labor-Management Conference held in Washington during November 1945, following the end of controls on labor disputes by the War Labor Board, made the following recommendation with respect to arbitration provisions of collective bargaining agreements:

"b. That the impartial chairman, umpire, arbitrator, or board should have no power to add to, subtract from, change, or modify any provision of the agreement, but should be authorized only to interpret the existing provisions of the agreement and apply them to the specific facts of the grievance or dispute."

The same appears to be true from the standpoint of the "substantive law" expressly furnished by "The Labor Management Relations Act", which is the second source to which the court is referred by the Supreme Court's Lincoln Mills law. The Act did establish the Federal Mediation and Conciliation Service specifically to provide assistance to employers and unions in the settlement of labor disputes (29 U.S.C.A. §§ 171–178). However, the arbitration contemplated by the Act is strictly of a voluntary nature and limited to the agreement between the parties. In fact, the Regulations of the Federal Mediation and

Conciliation Service, Part 1404, dealing with arbitration policies, functions and procedures, as last revised by the Director, effective January 8, 1957, states that the Service prefers to act only upon a joint request and that it may act upon the request of one party only Where The Parties Have Agreed that either of them may seek a panel of arbitrators. Moreover, Section 1404.5 of said Regulations specifically provides that:

"Where either party claims that a dispute is not subject to arbitration, the Service will not decide the merits of such claim."

(Federal Register, January 8, 1957; 22 Fed.Reg. 162)

The voluntary and strictly contractual nature of the arbitrations contemplated by the Labor Management Relations Act is further evidenced by the fact that the legislative history of the act includes the following statement from the Committee of Conference, House Report No. 510 of June 3, 1947:

"Section 204 of the Senate amendment stated that it should be the duty of employers and employees, and their representatives, to exert every reasonable effort to settle their differences by Collective Bargaining, and, if this should fail, to utilize the assistance of the Mediation Service. This provision is also included in section 204 of the conference agreement. But There Has Been Omitted Therefrom Language Which Appeared In The Senate Amendment Which Indicated That The Parties Were Under A Duty To Submit Grievance Disputes To Arbitration."

(U.S.Code Congressional Service, 80th Congress, First Session 1947, page 1169. Emphasis added.)

We turn now to "the policy of the legislation", which we take to mean the policy of the Labor Management Relations Act. This policy is set forth in the Act itself as follows:

"It is declared to be the policy of the United States to eliminate the causes of certain substantial ob-structions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise of workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C.A. § 151, emphasis added.

This policy makes no mention of arbitration, but places the utmost emphasis on Collective Bargaining And Negotiating the terms and conditions of employment. Was the omission of any reference to arbitration simply an oversight on the part of Congress? That seems unlikely in view of the fact that elsewhere in the Act it established the Federal Mediation and Conciliation Service to provide assistance to unions and employers in arbitrating disputes, as previously discussed herein. However, as previously noted, the Service does not function except where the parties have agreed to arbitrate the particular question submitted, and therein lies the answer to the question of why the policy makes no mention of encouraging arbitration. Involuntary or compulsory arbitration is the antithesis of bargaining and negotiating. Congress recognized this fact and deliberately spurned compulsory arbitration in favor of the collective bargaining-negotiating process. Time and again it has been suggested to Congress that resort should be had to some such means of resolving labor disputes when the parties reach an impasse—particularly where the public weal is apt to suffer as a result of the dispute. However, Congress has never seen fit to change its policy in that connection and has adhered to the purpose first enunciated. Congressional reasoning has been to the effect that compulsory arbitration is incompatible with the fundamental purpose of the Act itself. In the words of Senator Taft:

"We did not feel that we should put into the law, as part of the collective-bargaining machinery, an ultimate resort to compulsory arbitration, or to seizure, or to any other action. We Feel That It Would Interfere With The Whole Process Of Collective Bargaining. If such a remedy is available as a routine remedy, there will always be pressure to resort to it by whichever party thinks it will receive better treatment through such a process than it would receive in collective bargaining, and it will back out of collective bargaining. It will not make a bona fide attempt to settle if it thinks it will receive a better deal under the final arbitration which may be provided." (93 Cong.Rec. 3835–3836 (1947)); (Emphasis added.)

This incompatibility of compulsory arbitration with the policy of the Act and Congress' repeated rejection of it was recognized by the Supreme Court of the United States in the case of Amalgamated Association of Street, Electric Railway & Motor Employees of America, Division 998 v. Wisconsin Employment Relations Board, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364, in which it struck down a Wisconsin law requiring arbitration of labor disputes involving public utilities. At page 365 of 71 S.Ct. it stated:

"Like the majority strike-vote provisions considered in O'Brien, a proposal that the right to strike be denied, together with the substitution of compulsory arbitration in cases of 'public emergencies,' local or national, was before Congress in 1947. This proposal, closely resembling the pattern of the Wisconsin Act, was rejected by Congress as being inconsistent with its policy in respect to enterprises covered by the Federal Act * * *." (Emphasis added.)

At page 367 of 71 S.Ct. the same thought is expressed thusly:

" * * * reliance upon compulsory arbitration for ultimate solution of labor disputes destroys the free collective bargaining declared by Congress to be the bulwark of the national labor policy. * * * "

In view of these expressions and the plain wording of the policy of the Act itself, we can only conclude that our basic premise to the effect that there is no right to arbitrate a dispute unless the parties have specifically so agreed, finds express support in the Labor Management Relations Act.

This brings us to a consideration of the final source to which the district courts are referred, i. e., "state law, if compatible with the purpose of Section 301." Since such state law is usable merely for the purpose of guidance under the Supreme Court's mandate, *this source obviously is not limited to the state law of the forum but includes the laws of all states.* Thus the court may consider not only the laws of Louisiana, but those of any state which may have some bearing on the general subject matter. Called upon, as we are here, to interpret a contract, we may consider the common law of contracts in seeking a rule of interpretation "that will best effectuate the federal policy". This policy is rooted in the fundamental concept of collective bargaining; arbitration *agreements* are to be encouraged, but compulsory arbitration is odious. To best effectuate these principles district courts must construe the limitations placed by the parties on their agreements to arbitrate "strictissimi juris".

The accepted common law principles to be applied in the interpretation of agreements [3] applicable here are these: (1) Courts give legal effects to contracts as written. However general be the terms in which a contract is couched, it extends only to those things concerning which it appears that the parties intended to contract. The intent is to be determined by the words of the contract when they are clear and explicit and lead to no absurd consequences.

---

3. "And not incompatible with § 301."

It is the common intent that is to be sought, for if there is a difference of intent there is no common consent and no agreement. (2) When there is doubt as to the meaning of certain words, they may be explained by referring to other words and phrases used therein. (3) All clauses of an agreement are interpreted the one by the other, giving to each the sense that results from the entire Act. (4) Courts cannot make contracts for the parties, and can declare implied obligations to exist only when there is a satisfactory basis in the express provisions of the agreements which\ make it necessary to imply certain duties and obligations in order to effect the purposes of the parties. Before an obligation will be implied it must appear from the contract itself that it was so clearly in the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or that it is necessary to give effect to and effectuate the purpose of the contract as a whole.

### The Arbitration Clause

Almost all, if not all, present day collective bargaining agreements contain some sort of arbitration clause. The questions referable to arbitration under the provision of such agreements vary widely. In some instances the parties agree to arbitrate virtually every grievance that arises during the term of the contract, irrespective of the relation of such dispute to the contract provisions. Others are only moderately broad in scope and still others are highly restrictive, limiting the arbitration procedure to questions of interpretation and performance of the specific terms of the contract. It is in this latter category into which the clause before us fits. The pertinent section, 21–1, has been heretofore set out in full and the key language in the clause may be condensed to read as follows, to-wit:

"Only differences relating to the interpretation or performance of this agreement may * * * be submitted to arbitration."

Here, it is evident that the agreement to arbitrate is restricted to differences relating to the meaning of the terms employed in the agreement and those relating to whether or not the conduct of the parties is in accordance with the specific provisions of the agreement. The plain intention of the parties to restrict the matters referable to arbitration is particularly emphasized by the use of the word "only", which serves no purpose whatever except to accentuate the limited scope of the submission. Thus, a dispute between the parties as to what constitutes work peculiar to a classification within the meaning of Section 8–1 would certainly be a difference referable to arbitration, if it could not be settled by the grievance procedure provided for in Section 19. Likewise, a dispute as to the assignment of particular work to a particular classification would be referable to arbitration, since it would involve a difference relating to the performance of something agreed upon in the contract. Defendant agrees that this is so and is ready to arbitrate these differences, and accordingly to regard the arbitrator's decision in that connection as final to the end that such assignments under such circumstances will henceforth be made in accordance with the arbitrator's decision.

The dispositive issue is: Have the parties agreed to do more than to abide by the arbitrator's decision relating to the interpretation and performance of the agreement. Specifically, have they agreed to arbitrate the issue of damages or penalty for the violation of Section 8 of the agreement.

Counsel for the union insists that because the question of violation is an arbitrable one it necessarily follows that the arbitrator should have the power to prescribe a remedy. Arguing well, and at length, he asserts:

"The power merely to decide that an agreement has been violated without power to redress the injury would be futility in the extreme."

It would be, he says, a mere "wrist slapping" procedure. In support of his

position, he marshals numerous awards by various arbitrators. Particularly noted are two arbitration decisions by Charles Reynard, Professor of Law at Louisiana State University. The first is that of Mississippi Aluminum Corporation, November 14, 1956; 27 L.A. 625. There, the grievance involved the re-scheduling of a maintenance crew from the "normal" work week of Monday to Friday to an abnormal work week of Tuesday through Saturday. The arbitrator held that the company violated the contract and that:

> "The maintenance workers were entitled to time and one-half for all work performed on Saturdays * * over the company's objection that the contract makes no provision for any penalty for violation of the normal working schedule language of Article 5, Section 3. Similar objections can and sometimes are raised with respect to numerous types of violations, *but arbitrators have uniformly declared that the absence of contractual language imposing sanctions in such cases is no bar to the awarding of compensation.*" (Emphasis added.)

The second case is that of International Harvester Company, 9 L.A. 894, where the arbitrator stated:

> "The conclusion that no money arbitration award is proper in the case of violations of contract provisions which do not specifically provide for damages would have two effects. The first would be the substitution of some other method of settlement in the place of arbitration. The second would be the cluttering up of visions which would invite more trouble than they could ever be expected to prevent * * * (Collective bargaining agreements) will lose their effectiveness when they become so involved that laymen cannot possibly follow or understand them. It would contribute dangerously to that tendency if it were required that every contract clause had to include a damages provision.

> *This is the kind of thing which it must be assumed the parties intended would be handled in the light of the applicability of a particular clause to the particular problems that might arise under it.*" (Emphasis added.)

A third arbitration decision—the logic of which plaintiff's counsel commends to the Court—is that of Phillips Chemical Company, December 6, 1951, 17 L.A. 721. There, both parties agreed that on a particular day the complainant should have been assigned 5½ hours of overtime work which was mistakenly allocated to another employee. This is what the arbitrator had to say about the remedy and his right to award such a remedy.

> "The sole question, is what is complainant's remedy? The union's position is that he is entitled, without doing any work for it, 5½ hours pay at the overtime rate. The company contends that he is entitled to such pay only after having worked 5½ hours overtime on any day which is convenient to him. The company contends that the union is seeking a money penalty; that the agreement does not provide for it; and that therefore such an award would violate the customary prohibition against arbitrators adding to an agreement.

> "The purpose of arbitration is to settle disputes justly and fully, as a substitute for strikes and lock-outs. If a grievance has no merit, relief is denied; but if it has merit, adequate relief should be granted. That is what the parties contemplate. Anything less than that would not effect justice and would not satisfy the complaining party. Therefore, *it is implied in the arbitration section that the arbitration board has power to grant adequate relief. The power merely to decide that the agreement has been violated, without power to redress the injury, would be futility in the extreme.* Furthermore, Article 14 provides 'The arbitration board should have jurisdiction over

all the disputes arising under the terms of this agreement;' and jurisdiction means power to grant relief.

"Hence, it is implied that where breach of the agreement has caused a money loss, the board has power to award the proper amount as compensatory damages. A specific clause to that effect would, of course, make that power clear, but a clause is not essential. Therefore, *making such an award is not adding a term to the agreement; it is merely carrying out the clearly implied purpose of arbitration, viz., to grant proper relief for meritorious grievances.* In the courts, the customary relief is money damages; it is not surprising that frequently in arbitration cases the same relief is required."

These arbitrators' decisions ostensibly support the union's contention here, but we find the arguments therein set out unpersuasive of the narrow issue of this case. The value of arbitration cannot be disputed nor should its value be minimized, but we cannot write into this agreement by implication an obligation by either the union or the company to arbitrate under Section 21 thereof the issue of a penalty or remedy for a violation of Section 8 thereof. There is no satisfactory basis in the express contract to find this obligation clearly within the contemplation of the parties, nor is it necessary to imply such a covenant in order to effectuate the contract as a whole. We limit this conclusion to the specific case before us. If the parties had agreed to arbitrate all grievances the result would be different. If the contract provided a penalty, the result would be different. If the agreement provided that remedies in all grievances should be left to the arbitrator, the result would

be different. If the grievance here had been based on other sections of this very contract a remedy would be in order, e.g., Section 14 dealing with vacations; Section 15 dealing with pay for those on jury duty; Section 16 dealing with severance pay; Section 17 dealing with annuities; Section 18 dealing with funeral leaves.[4] But this comprehensive agreement, bearing clear tokens of comprehensive preparation, fails to indicate or suggest an unintentional omission of any provision necessary or essential to carry into full effect the complete understanding of the contracting parties, and it contains no language to be interpreted and applied for determining what an appropriate remedy might be for a violation of Section 8.[5]

## Conclusion

The scope of the arbitration agreement was solely for the parties to determine by collective bargaining. The determination of whether the disputed issues is arbitrable is inescapably for the court and must be determined by an interpretation of the agreement in accordance with applicable substantive federal law to be fashioned by the courts pursuant to the mandate in Lincoln Mills.[6]

We find nothing in the terms of the carefully drawn agreement to warrant a conclusion that the parties to it agreed therein to submit to arbitration the question of a penalty or of an award for a breach of Section 8 thereof. Nor do we find anything in Lincoln Mills and its teachings requiring us, under the facts of this case, to so extend the agreement by implication in order to effectuate federal policy.

Our duty, when called upon to do so, is to enforce collective bargaining agreements on behalf of or against labor unions as they are written. All of our laws

---

4. In these clauses there is language to be applied for determining an appropriate remedy, e. g., if there is a dispute as to whether or not a certain employee qualifies for a vacation without pay, the arbitrator certainly has the right to order the company to give the employee a two weeks' vacation with pay.

5. For analogy only, see Local No. 149 v. General Electric, 1 Cir., 1957, 250 F.2d 922, 923.

6. Justice Frankfurter, in his dissent therein, comments in effect that this federal law "is as yet in the bosom of the judiciary."

734

governing employer-employee relations have been rooted in the fundamental concept of collective bargaining. Such has been the consistent policy of Congress—a policy reflecting the faith of a nation that its people can best solve their problems and resolve their differences in an intelligent and democratic manner. In countless thousands of cases this system has worked well, unscarred by the bitter economic strife which has accompanied the highly publicized exceptions to the general rule. We are aware of the viewpoint urged in responsible quarters that the interests of effective labor arbitration would best be served by committing to the arbitrator broad powers. This court is not ignoring the force of this argument, but *compulsory* arbitration is an anathema to both labor and management. The one thing that stands out above everything amid all the policy, history, legislative background and jurisprudence surrounding the subject of arbitration is that it must be voluntary to be effective, that compulsion is odious, and that a party should never be required to arbitrate unless he has contracted to so do. Reliance upon third parties to resolve all differences between employer and employee is not a healthy nor a desirable development for the reason that the parties themselves come to exert less and less influence over their own relationship with one another and they assume more or less permanent roles of antagonists vying for such advantages as may be wrung from the arbiters.

Congress, in amending the Labor Management Relations Act to include Section 301, sought to provide a forum for damage suits arising out of breach of collective bargaining agreements. It would be ironic if the federal courts should now read into arbitration clauses a requirement that the question of damages for breach of contract itself must be submitted to arbitration, thus rendering the admitted primary purpose of the Act wholly ineffective for all practical purposes.

The collective bargaining here involved is scheduled to terminate several months from now. The parties may, if they wish, extend the arbitration clause to empower the arbitrator to fix a remedy. They may if they wish amend the contract so as to include the remedy itself. They may, if they wish, agree that all grievances be arbitrated.

The union is entitled to an order requiring the company to proceed forthwith under the provisions of Section 21 of its current collective bargaining agreement to the appointment of an arbitrator who, in conjunction with the arbitrator to be appointed by the union and such third party as the first two may select, shall hear and determine the following issue:

"Did the company's use of employee La Sueur in connection with the overtime on the platforming unit on March 3, 1957, constitute a violation of Section 8 of the contract?"

The arbitrator's authority will be limited to a determination of that issue alone and shall not extend to the formulation of any penalty or the fixing of damages in the event such question is determined in the affirmative. The union's claim of incidental damage is based on the company's refusal to arbitrate the penalty and/or damage question, and is denied. If the union's position on the issue submitted is sustained by the arbitrators, they (the union) will not be without a remedy. However, if I may be permitted a bit of "wrist slapping", I will add that this union and this company have enjoyed excellent relations and they should certainly adjust their differences here.

Decree will be submitted by defendant after notice.