**REFINERY EMPLOYEES UNION OF LAKE CHARLES AREA, Appellant,**

v.

**CONTINENTAL OIL COMPANY,**
Appellee.

No. 17344.

United States Court of Appeals
Fifth Circuit.
June 25, 1959.

George W. Liskow, Lake Charles, La., Liskow & Bond, Lake Charles, of counsel, for appellant.

William R. Tete, Lake Charles, La., Keith W. Blinn, Houston, Tex., Jones, Kimball, Harper, Tete & Wetherill, Lake Charles, La., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This appeal concerns the interpretation of an arbitration clause in a collective bargaining agreement. Two ques-

tions are raised. (1) Does the Court have authority to determine arbitrability and in so doing limit the scope of the arbitrable issue to be referred to the arbitrator? (2) Was it the intention of the parties, as expressed in the contract, to submit to arbitration the determination of the remedy for a breach of contract, including authority to award damages for misassigned overtime, contrary to management policy of paying only for work performed?

The Refinery Employees Union of the Lake Charles Area, plaintiff-appellant, and the Continental Oil Company, defendant-appellee, are parties to a collective bargaining agreement. The Union sued for specific performance of the arbitration provision, under Section 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C.A. § 185.[1] Both parties and the trial judge treated the action as a suit for a declaratory judgment.

### I.

The agreement regulates, among other matters, observance of craft lines separating the duties of employees in a particular job classification from the duties of employees in another job classification.[2] One of the purposes of job classification is to provide a basis for the equa-

1. Textile Workers Union v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 923, 1 L.Ed.2d 972; Goodall-Sanford, Inc. v. United Textile Workers, 1957, 353 U.S. 550, 77 S.Ct. 920, 1 L.Ed.2d 1031; General Electric Co. v. Local Union 205, United Electrical Workers, 1957, 353 U. S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028. cf. Item Co. v. New Orleans Newspaper Guild, 5 Cir., 1958, 256 F.2d 855.

2. Section 8, entitled "Job Classification" provides: "8-1 Work peculiar to a classification shall be performed by employees assigned to that classification, except as otherwise provided for in this agreement, but the Company reserves the right to assign to such work available employees regularly assigned to other classifications when necessary for the efficient operation of the plant, provided that employees from the classification to which such work is regularly assigned are not available. Any employee so assigned shall receive the rate applicable to his permanent classification or to the classification to which he is assigned, whichever is higher, except that for less than four (4) hours service, an employee's rate shall not be changed. ¶ 8-2 In an emergency, as defined in 8-7, employees shall be assigned to any work required, without regard to their regular assignment. The pay provisions as outlined above shall apply. ¶ 8-3 Temporary assignments within the operating division, made solely for 'break-in' or training purposes shall be excepted from the pay provisions outlined above. ¶ 8-4 When it is known that the absence of any permanently assigned employee within any operating progression unit will exceed two (2) days, and when such absence created the need for replacement, the vacancy will be filled by the qualified employee next in line within the progression unit. When such procedure is impractical because of the unavailability of employees adequately trained to advance, the vacancy shall be filled from within the job classification in which it occurs. The moves will be accomplished as quickly as re-scheduling is practical. ¶ 8-5 In the event an operating vacancy is expected to exist for two (2) days or less, it may be filled by 'splitting the shift'. ¶ 8-6 No foreman or supervisor who is exempt under the Wage-Hour Law shall perform any work peculiar to any classification or craft in which employees are non-exempt under the Wage-Hour Law, except in the event of an emergency or for training purposes. This does not limit the right of a supervisor to transport men or materials in a vehicle used in the process of supervision. ¶ 8-7 An emergency for the purpose of 8-2 and 8-6 hereof is defined as a situation which constitutes a hazard to life or property or which results from any order of the United States Government, state or local authority. ¶ 8-8 Hourly employees assigned as supervisors will not be paid at a rate equal to or less than the rate of the employees they supervise. ¶ 8-9 No exempt foreman will be called out to do maintenance work when a craftsman from the craft is available except in emergencies. ¶ 8-10 It is agreed that any classified work covering maintenance, operation or repair of refinery equipment now being done by employees of the Company shall not be contracted out as long as the Company has the equipment and the necessary qualified employees available from among present or laid off employees. It is the intent of this paragraph that when the

ble distribution of overtime, because of the premium pay that makes overtime work attractive to employees.

During a night shift at the Lake Charles refinery, March 3, 1957, a dispute arose between the Company's shift foreman and the Union's representative over the foreman's assignment of an employee to work four hours overtime in a job that did not fit into his permanent classification, to the detriment of another employee who was allegedly entitled to that particular overtime assignment because of his job classification. March 13, after discussions in which the Company agreed that the foreman had made a mistake, the Union representative filed a formal grievance, requesting four hours pay for the aggrieved employee, "since his four hours were taken away from him and given to another classification".

March 18 the Company replied, "regretting the error" and promising to make every effort to see that this type of mistake would not be repeated but refusing to pay anything to the aggrieved employee, because "it is the policy of the Company to pay only for work performed."

A number of letters were then exchanged between the Company and the Union. The Company changed its position from admitting having made a mistake to arguing that the terms of the agreement referring to permanent or temporary assignment are vague, that the shift foreman was confronted with an emergency, that anyway he tried to call an employee in the proper classification who was off duty, thereby showing good faith, and that the employee who did perform the work received premium pay. But the Company insisted on maintaining its policy of *no work—no pay*. The Union charged that the Company was guilty of "a deliberate violation of the terms of our signed agreement" and that the improper work assignment was one of a long series of such violations; "management [says] 'we are sorry', and the infractions continue". There were

Company has the necessary qualified employees of the craft concerned, they shall

more letters. The Company offered to make concessions in order to end the dispute. It was willing to give the aggrieved employee "four hours overtime work as Cat Reformer Controlman 1st * * * to be 'made work', not vacation or sick relief * * * [so that his] assignment will not reduce any overtime conceivably worked by another employee". Still the Company would not budge from its policy of paying only for work performed.

The proposed solution was unsatisfactory. The Union invoked arbitration. The Company agreed to arbitration, "provided, however, that the arbitrator's decision shall be limited to a determination of whether such violation occurred and if the arbitrator shall determine that such violation occurred, the remedy shall be the subject of negotiation between the company and the union". The Union rejected the Company's proposed limitation on the arbitration. The Union called it "an attempt in very bad faith by the company to avoid coming to grips with the real problem". The real problem, said the Union, was "difference of opinion as to the award rather than a difference of opinion as to the error committed". The Union stated that:

"It is our position that the question of whether or not the arbitrator has the right to make an award is a matter of interpretation of the contract to be made by the * * * arbitrator. * * * [T]he interpretation of the contract [is] a matter to be left to the arbitrator."

As a last "effort to find an amicable basis for settlement * * * [the Company] offered to permit [the aggrieved employee] to work four hours any time selected by him at the applicable rate of pay". The Company "refuse[d] to arbitrate on the question of pay for work not performed, since it related neither to the interpretation nor performance of the contract". The Union then filed a suit for specific performance of the arbitration clause.

be upgraded before resorting to contract labor."

It is apparent on the face of these letters that there was never any serious dispute as to the underlying problem of whether the Company's shift foreman had violated the work assignment provisions of the agreement. Moreover, the Company was willing to make the aggrieved party whole by giving him additional work at the equivalent pay and classification. The serious dispute was whether the Company should pay what in effect is a penalty and is contrary to its policy against payment for work not performed, in the absence of a provision in the contract awarding damages or requiring payment for work not performed.

The Union contends that determination of the remedy, including payment of damages, is implicit in arbitrating grievances; that this is a matter for arbitrators, not courts, the power to arbitrate an underlying problem carrying with it the power to dispose of the whole problem. The Union asserts that the district court went into the merits of the grievance, foreclosed any independent decision by an arbitrator, and put the Union in a position of having a right without a remedy.

▆▆▆ The district court held that "the determination of whether the disputed issues is arbitrable is inescapably for the court". [160 F.Supp. 733.] It could "find nothing in the terms of the carefully drawn agreement to warrant a conclusion that the parties to it agreed therein to submit to arbitration the question of a penalty or of an award". The district court held that although the Union was entitled to an order requiring the Company to proceed with arbitration of the issue of work assignment, "the arbitrator's authority will be limited to a determination of that issue alone and shall not extend to the formulation of any penalty or the fixing of damages". We affirm.

## II.

The Union now concedes, contrary to its position in the district court, that arbitrability of a grievance, meaning the underlying problem, is a preliminary question within the province of the court. The Union contends however that the court may go that far and no farther; that in this case the court could not restrict the arbitration to a decision as to whether there was a violation of the contract and could not prohibit the arbitrators from awarding damages; an arbitrator's authority is for arbitrators to decide.

This amounts to saying that a court may order parties to arbitrate, but cannot tell the arbitrator what to arbitrate.

▆▆▆ We cannot accept such a proposition. Private arbitration fits in well with responsible industrial self-government and is favored by the courts.[3] But whether an issue is an arbitrable one is a legal question for the court rather than for the arbitrator. Lodge No. 12, Dist. No. 37, International Association of Machinists v. Cameron Iron Works, 5 Cir., 1958, 257 F.2d 467, certiorari denied 358 U.S. 880, 79 S.Ct. 120, 3 L.Ed.2d 110; Engineers Association v. Sperry Gyroscope Co., 2 Cir., 1953, 251 F.2d 133; International Union, United Automobile

---

3. See Gorske, Arbitration Back-Pay Awards, 10 Lab.L.J. 18 (1959); Comment, Arbitration Union Section 301(a), 59 Col.L.R. 153 (1959); Murphy, Current Trends in Labor Arbitration, 11 N. Y.U. Conf. On Labor, 231 (1958); Kramer, Arbitration Under the Taft-Hartley Act, 11 N.Y.U. Conf. on Labor, 255 (1958); Cox, Grievance Arbitration in the Federal Courts, 67 Harv.L.Rev. 591, 604 (1954); Feinsinger, Enforcement of Labor Agreements—A New Era In Collective Bargaining, 43 Va.L.Rev. 1261, 1274 (1957); Frey, The Proposed Uniform Arbitration Act Should Not Be Adopted, 10 Vand.L.Rev. 709 (1957); Howard, The Proposed Uniform Arbitration Act: Yes or No, 22 Mo.L.Rev. 999, 1024 (1955); Kharas & Koretz, Judicial Determination of the Arbitrable Issue in Labor Arbitration—Some Recent Developments, 7 Syracuse L.Rev. 193, 195–98 (1956); Pirsig, Some Comments on Arbitration Legislation and the Uniform Act, 10 Vand.L.Rev. 685, 692–99 (1957); Summers, Judicial Review of Labor Arbitration or Alice Through the Looking Glass, 2 Buffalo L.Rev. 1, 3–13 (1952).

Aircraft v. Benton Harbor Malleable Industries, 6 Cir., 1957, 242 F.2d 536; Local No. 149, American Federation of Technical Engineers (A. F. L.) v. General Electric Company, 1 Cir., 1957, 250 F.2d 922, certiorari denied, 1958, 356 U. S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813; United Steelworkers of America v. American Manufacturing Co., 6 Cir., 264 F.2d 624. The power to determine arbitrability carries with it the power to define and limit the arbitrable issue. See Council of Western Electric Technical Employees v. Western Electric Company, 2 Cir., 1956, 238 F.2d 892, and Boston Mutual Life Insurance Co. v. Insurance Agents International Union, 1 Cir., 1958, 258 F.2d 516. Even giving the "broadest liberalities" to private arbitration, parties to a contract cannot be forced to arbitrate an issue they did not agree to arbitrate. "[W]hen one of the parties needs the aid of a court, and asks the court for a decree ordering specific performance of a contract to arbitrate, we think that the court, before rendering such a decree, has the inescapable obligation to determine as a preliminary matter that the defendant has contracted to refer such issue to arbitration, and has broken this promise." Local No. 149, American Federation of Technical Engineers (A. F. L.) v. General Electric Co., 1 Cir., 1957, 250 F.2d 922, 927, certiorari denied 1958, 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813.[4]

The process of deciding just what the parties did agree to arbitrate brings the court to a definition of the arbitrable issue. That definition marks the jurisdictional boundaries of the arbitration tribunal and necessarily limits the authority of the arbitrators.

■ The plaintiff's pleadings support these views. The plaintiff moved for a summary judgment on the ground that it was "entitled as a matter of law to a judgment ordering the defendant to proceed with arbitration of the grievance without limitation on the arbitrator to provide and order a remedy for breach of contract as set forth in said grievance". This motion directly raised the preliminary question of the arbitrator's authority. The district court was confronted squarely with the question: does the arbitrable issue include, "without limitation", matters relating to the remedy for breach of contract as set forth in the grievance? Faced with the question by the plaintiff's motion, it was proper for the trial court to decide it.

To the extent that a court excludes as non-arbitrable the real bone of contention, here the remedy, not the underlying dispute, of course the court forecloses the arbitrator's determination of the merits of the non-arbitrable issue. But that is an inevitable consequence of the difference of opinion between the Court and the Union as to what is arbitrable under the contract. Boston Mutual Life Ins. Co. v. Insurance Agents Int. Union, 1 Cir., 1958, 258 F.2d 516. There is no disservice to the principle of arbitration and no denial of the expertise of arbitrators on the merits of the grievance, if, as we think, the arbitrable grievance is limited to the question of whether the overtime work was assigned in accordance with proper job classification.

■ A contract is before us, a firm agreement presumably made after the usual labor-management negotiations. It is important to labor [5] and management to have a collective bargaining agreement enforced according to the intention of the parties, shielded against the risk of an arbitrator's abuse of authority arising out of a possible predilection for arbitration. The parties are free to bargain as to the width of the coverage of an arbitration clause but, in the absence of an express provision allowing the arbitrators to decide arbitrability, courts

4. Judge Magruder, for the First Circuit, reaffirmed this holding in Boston Mutual Life Insurance Co. v. Insurance Agents International Union, 1 Cir., 1958, 258 F. 2d 516, reversing the holding of Judge Wyzanski, In re Jacobson, D.C., 161 F.

Supp. 222, strongly relied on by the appellant in this case.

5. For example, to resist claims for damages based on alleged violations of the no-strike clause.

must determine the scope of the arbitration clause and, when appropriate, as in this case, set guideposts for the arbitrators to follow. On the facts in this case, a judicial determination now of the arbitrable issue, with some metes and bounds, seems more likely to promote industrial peace and more likely to lead to settlement of the real dispute in the proper forum (at the bargaining table) than judicial abnegation based on broad (and vague) policy grounds.

## III.

The difficult question in this case is whether the district court correctly limited the arbitrable issue in holding that the parties to the collective bargaining contract did not intend to submit to arbitration the remedy for misassignment of overtime work, including authority to award wages for work not performed.

■ This Court is committed to the policy that "private arbitration in the labor-management field is to be afforded broad liberalities". Lodge No. 12, Dist. No. 37, International Association of Machinists v. Cameron Iron Works, 5 Cir., 1958, 257 F.2d 467, 474, certiorari denied 358 U.S. 880, 79 S.Ct. 120, 3 L.Ed. 2d 110. But this policy does not permit the Court to find agreement where there is no agreement.

The arbitration clause in the case at bar [6] is not a broad grant of authority to the arbitrators,[7] a *quid pro quo* for giving up the right to strike. The Union

6. Section 21, entitled "Arbitration", provides: "21-1 Only differences relating to the interpretation or performance of this agreement which cannot be adjusted by mutual agreement, after processing through the grievance procedure may upon written notice by one party to the other, not later than sixty (60) days after the date of the decision of the regional manager of manufacturing be submitted to arbitration. 21-2. The party desiring arbitration shall notify the other party of the matter to be arbitrated, and the name of the arbitrator selected by it, within five (5) days after giving such notice. The other party shall appoint an arbitrator and shall within five (5) days notify the first party of such appointment. The two (2) arbitrators so named shall confer within ten (10) days and attempt to reach an agreement. Should they be unable to agree within five (5) days of their first conference a third member shall be selected by these employer and employee representatives. The majority decision of such board of arbitrators so selected shall be rendered within ten (10) days of appointment, and shall be binding upon both parties signatory hereto and retroactive to the date upon which the matter for arbitration was first presented in writing to the superintendent of the refinery as outlined under 19-2. 21-3 The expense of the arbitrator selected by the Company shall be borne by the Company; the expense of the arbitrator selected by the Union shall be borne by the Union; and the expense of the third arbitrator, if such is selected, shall be borne by the Company and the Union equally."

7. Compare the arbitration clause recommended by the American Arbitration Association: "The American Arbitration Association recommends the following general arbitration clause in labor agreement; 'Any dispute, claim or grievance arising out of or relating to this agreement shall be submitted to arbitration under the Voluntary Labor Arbitration Rules, then obtaining, of the American Arbitration Association. The parties agree to abide by the award, subject to such regulations as any Federal agency having jurisdiction may impose. The parties further agree that there shall be no suspension of work when such dispute arises and while it is in process of adjustment or arbitration.'" Dept. of Labor Bull., 908–16, at p. 858.

"Even though an arbitration clause covering only 'disputes concerning the interpretation and application' of the collective agreement cannnot mean barely the translation of words, it must impose some limit. The phrasing of the arbitration clause is often an important issue in collective bargaining. Experienced negotiators are thoroughly aware of their ability to choose between the comparatively narrow clause noted above and a wide-open undertaking to arbitrate 'any dispute, difference, disagreement or controversy of any nature or character' which may arise during the term of the agreement. When the former clause is selected, the company believes that a limit has been imposed upon the power of the arbitrator. * * * The contrast between the wide-open clause and the conventional phraseology is too plain to put down to

expressly reserved the right to strike during the term of the agreement.[8] The arbitration clause in question is a limited clause that does not purport to cover "any or all" disputes. It covers: *"Only differences relating to the interpretation or performance of this agreement"*. The contract is silent as to the remedy, if any, for misassigned overtime. The arbitration clause is silent as to the power of arbitrators to provide a remedy or to impose a penalty.

The underlying problem as to whether the overtime work was assigned to an employee in the proper classification is plainly a difference expressly covered by the arbitration clause. The real dispute as to whether the Company should pay for time not worked, as a penalty imposed on the Company to discourage future violations, is plainly not covered in the contract—unless, giving a broad interpretation to the arbitration clause, the Court should hold that the authority of an arbitrator to make awards and fix damages is implied in the arbitration of every grievance.

In Marchant v. Mead-Morrison Mfg. Co., 1929, 252 N.Y. 284, 169 N.E. 386, 390, 391, a case decided when he was on the Court of Appeals of New York, Mr. Justice Cardozo stated some fundamental principles we think are applicable in the instant case, even though a commercial arbitration was involved:

"The question is one of intention, to be ascertained by the same tests that are applied to contracts generally. Courts are not at liberty to shirk the process of construction under the empire of a belief that arbitration is beneficent, any more than they may shirk it if their belief happens to be the contrary. No one is under a duty to resort to these conventional tribunals, however helpful their processes, except to the extent that he has signified his willingness. Our own favor or disfavor of the cause of arbitration is not to count as a factor in the appraisal of the thought of others. * * * Parties to a contract may agree, if they will, that any and all controversies growing out of it in any way shall be submitted to arbitration. If they do, the courts of New York will give effect to their intention. A submission so phrased, or in form substantially equivalent, does not limit the authority of the arbitrators to an adjudication of the breach. It is authority to assess the damages against the party in default."

The arbitration clause in question was similar to the arbitration clause before us:

"It does not say that any and all controversies growing out of the contract shall be settled by arbitration, though the plaintiff would have us hold that its effect is nothing less. The submission is to be confined to controversies or differences of opinion as to 'the construction of the

---

inadvertence. The apparent purpose is to confine the power of the arbitrator. Apparently the parties choose it because one party, usually the employer, distrusts arbitration at least to the point of insisting upon the inclusion of some safeguard against the arbitrator's imposition of significant obligations not contemplated by the agreement and quite beyond its scope. *The clause does not tell what the arbitrator should not do. It tells what he cannot do.*" Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1483, 1500, 1509 (1959).

8. Section 22-1 of this collective bargaining agreement, which is the section dealing with strikes and lockouts, provided: "22-1 The Union and its members, individually and collectively, will not, during the term of this agreement, cause, permit, or take part in any strike, picketing, sit-down, stay-in, slow down, or other curtailment or restriction of production or interference with work in or about the Company's refinery or premises until the procedure provided herein for the settlement of grievances has been complied with nor thereafter until sixty (60) days after a majority of all employees in the bargaining unit have, by a secret strike vote, approved the strike and the Union shall have so certified in writing to the Company."

terms and conditions' of the contract, and controversies or differences as to the 'performance' of the contract. * * * We think there was no intention to clothe the arbitrators with power to settle every difference having its genesis in the contract. Their function was more modest. Questions might arise as to the meaning of the contract or the plans and specifications. The arbitrators were to give the answer. Questions might arise as to the performance of covenants and conditions where there was no doubt as to the meaning. Again the arbitrators would answer. * * * They did not limit themselves to fixing the value of what had been done as compared with that omitted, according to the practice in recoupment. Mondel v. Stell, 8 M. & W. 858. They charged the dilatory seller with consequential damages of nearly $1,000,000, on the ground that the effect of the delay was to plunge the buyer into ruin. * * * It is not a question whether the damages awarded proceed from the default so directly and certainly that the plaintiff might have recovered them if he had been suing in the courts. The judgment of the arbitrators within the lines of the submission is not to be impeached for misconception of the law. It is rather a question whether the damages are of such a nature that arbitrators so commissioned may consider them at all."

There is a difference between arbitration of a commercial dispute and arbitration of a labor dispute. That difference is not so great when there is a limited arbitration clause, as in this case. In Marchant v. Mead-Morrison the court found that the parties did not intend to arbitrate "every difference having its genesis in the contract", but only differences as to the "construction" and "performance" of the contract.[9] Such a submission withholds from the arbitrators authority to give consequential damages. Citing this case as authority, several courts have held squarely that "unless the arbitrator is [expressly] given the power to award damages * * * an award attempting to do this is void as beyond the power of the Board [of arbitrators]". Lone Star Cotton Mills v. Thomas, Tex. Civ.App., 1959, 227 S.W.2d 300, 307. Guidry v. Gulf Oil Corporation, Tex.Civ. App., 1959, 320 S.W.2d 691, is to the same effect. "It is not lawful for arbitrators to fix damages arising out of the matters submitted to them unless the issue of such damages is also specifically submitted". Publishers' Association of New York City v. New York Typographical Union No. 6, 1938, 168 Misc. 267, 5 N.Y.S.2d 847, 853.

The precise question at issue, however, has not been decided in any reported decision, as far as our research goes.[10]

9. In Marchant v. Mead-Morrison the court found a limited submission. In later cases, New York courts have held that when an arbitrator is given power to decide a controversy in its entirety, "any and all controversies", the arbitrator has an implied power to award damages. Utility Laundry Service v. Sklar, 1949, 300 N.Y. 255, 90 N.E.2d 178, 180.

10. Few arbitrators, however, have had any doubts as to the extent of their jurisdiction in awarding damages for breach of contract. International Harvester Company, 1947, 9 L.A. 894; Standard Lime and Cement Company, 1956, 26 L. A. 468; Bridgeport Grass Company, 1952, 19 L.A. 690; International Harvester Company, 1950, 14 L.A. 430; Ingersoll-Rand Company, 1947, 7 L.A. 564; Beth-lehem Steel Company, 1947, 7 L.A. 493; United States Rubber Company, 1949, 13 L.A. 840; Phillips Chemical Company, 1951, 17 L.A. 721; Mississippi Aluminum Corporation, 1956, 27 L.A. 625; Vanette Hosiery Mills, 1951, 17 L.A. 349; American Machine and Foundry Company, 1950, 15 L.A. 822. Various reasons are given: (1) the company must be given a penalty, to discourage future contract violations; (2) the job classification and work assignment provisions are valueless, unless an award (damages) is given for their breach; (3) like any other contract violation or tort, damages are inseparably connected with the claim; (4) the aggrieved employee, in an overtime case, is entitled to work the overtime hours when they are available, not at

In United Electrical, Radio & Machine Workers of America v. Miller Metal Products, 4 Cir., 1954, 215 F.2d 221 and in International Union United Furniture Workers of America v. Colonial Hardwood Flooring Co., 4 Cir., 1948, 168 F.

some later time. Some arbitrators have held, however, that equivalent work at the same pay is the proper means of disposing of the dispute since it "satisfies the dominant intention of the parties" and enables the error to be "equitably rectified". Celanese Corporation of America, 1954, 24 L.A. 168; Goodyear Atomic Corporation, 1956, 27 L.A. 634.

The International Harvester Company decision is considered the leading case on the authority of arbitrators to make money awards. In this case employees were given new piece-work assignments but were not informed of the piece-work price until after they had worked on them some time. The contract required that employees be notified of the rate in advance. The arbitrator held that the employees were entitled to be paid at average earnings rather than at the price on the jobs involved. The case has a special bearing here because the decision was based in part on the company's practice (policy) in the past of making adjustments on the basis of average earnings. The case did not involve payment for work not performed. The language of the arbitrator has been quoted in a number of cases and legal articles: "The conclusion that no money arbitration award is proper regarding contract provisions which do not specifically provide for it would have two effects. The first would be the substitution of some other method of settlement in the place of arbitration. The second would be cluttering up of the contract with a lot of 'liquidated damage' provisions which would invite more trouble than they could ever be expected to prevent. It will be unfortunate if collective bargaining agreements develop along the lines of the revenue laws, with provision necessarily being made for every little hair-line question which may arise between adverse parties pressing conflicting interests. They will lose their effectiveness when they become so involved that laymen cannot follow or understand them. It would contribute dangerously to that tendency if it were required that every contract clause had to contain a damages provision. This is the kind of thing which it must be assumed the parties intended would be handled in the light of the applicability of a particular clause to the particular problems that might arise under it."

Phillips Chemical Company, 1951, 17 L.A. 721 was an arbitration of a claim for overtime. "The purpose of arbitration is to settle disputes justly and fully, as a substitute for strikes and lock-outs. If a grievance has no merit, relief is denied; but if it has merit adequate relief should be granted. That is what the parties contemplate. Anything less than that would not effect justice and would not satisfy the complaining party. Therefore, it is implied in the arbitration section that the arbitration board has power to grant adequate relief. The power merely to decide that the agreement has been violated, without power to redress the injury, would be futility in the extreme. Furthermore, Article 14 provides 'The arbitration board should have jurisdiction over all the disputes arising under the terms of this agreement;' and jurisdiction means power to grant relief. ¶ Hence, it is implied that where breach of the agreement has caused a money loss, the board has power to award the proper amount as compensatory damages. A specific clause to that effect would of course make that power clearer, but a clause is not essential. Therefore, making such an award is not adding a term to the agreement; it is merely carrying out the clearly implied purpose of arbitration, viz., to grant proper relief for meritorious grievances. In the courts, the customary relief is money damages; it is not surprising that frequently in arbitration cases the same relief is required."

The Mississippi Aluminum, 1956, 27 L.A. 625, case involved rescheduling a maintenance crew from a normal work week on Monday to Friday to an abnormal week of Tuesday to Saturday. The arbitrator held that the crew should be paid time and a half for Saturday.

Vanette Hosiery Mills, 1951, 17 L.A. 349 was a piece-work case. "The Company insists that back pay cannot be awarded in any event under the Agreement (except under Section 7), because there is no clause providing therefor; citing the case of Lone Star Cotton Mills v. Thomas, 227 S.W.2d 300 [14 L.A. 826]. * * * [T]he Agreement goes further than the cited case, where the provision was, arbitration should 'decide and settle the matter', which the court held gave the arbitrators merely power to say whether the contract was breached. The Agreement here provides (Section 9, paragraphs 1 and 2) for 'decision by arbitration' and 'a decision on the grievance'

2d 33, 35, the court held that claims for damages for breach of a no-strike clause are not arbitrable, since the arbitration clause contemplates matters subject to the grievance procedure and not such controversies as strikes and secondary boycotts which are entirely foreign to the grievance procedure. "It would have been possible", Judge Parker held in Colonial Hardwood, "for the parties to provide for the arbitration of any dispute which might arise between them; but they did not do this, and the rule noscitur a sociis applies to the arbitration clause in the grievance procedure to limit its application to controversies to which the grievance procedure was intended to apply". A similar result was reached with reference to a claim for consequential damages in a contract clause referring to a dispute over hiring and transferring employees. Council of Western Electric Technical Employees National v. Western Electric Co., 2 Cir., 1956, 238 F.2d 892. In these and other cases that might be cited, the federal courts have been fully aware of the force of the considerations supporting a broad commitment of labor disputes to arbitration, but have adhered firmly to the principle that remedies (damages) are not arbitrable unless there is clear contractual authority for their arbitrability. See especially Local No. 149 of American Federation of Technical Engineers (A. F. L.) v. General Electric Company, 1 Cir., 1957, 250 F.2d 922, 926, 930.

The contract in the instant case covers forty-two pages, detailing wages and hours of work, overtime, premium time, shifts and shifts differentials, job classification, seniority, craft seniority preference lists, military leave, holidays, vacations, jury duty, severance notice and pay, annuities and benefits, funeral leave, grievance procedure, arbitration, strikes and lock-outs, working conditions, and other matters. With all of that, there is no list of job classifications and rate ranges and, as in Local No. 149 of American Federation of Technical Engineers (A. F. L.) v. General Electric Company, "no language by way of job descriptions which could be interpreted or applied for the purpose of determining whether the duties performed by a particular em-

—which sounds much like the cited case —and then goes further (paragraph 3) by providing 'for 'enforcing this contract'. This express provision can mean, in many instances where the Agreement has been breached by wrongful action, nothing less than the awarding of back pay."

Celanese Corporation of America, 1954, 24 L.A. 168 concerned a dispute over misassigned overtime. The Company practice (policy) had been to offer equivalent work at the same pay, not to pay for work not performed. The arbitrator held: "The procedure that the Parties set up, in the beginning of 1953, to apply Article 11, Subdivision (e) of the Contract in this Department, did not include or refer to any method to correct any errors in the procedure agreed upon. Subdivision (e) of Article 11 does not prescribe any method—it simply provides that 'overtime shall be distributed as equally as possible.' Unless the Parties had agreed to a single method, the method offered by the Company in this case satisfies that provision equally, as does the method sought by the Union. How the Parties themselves have construed or applied a contractual provision, which is ambiguous or which is stated in general terms, as Section 11, Subdivision (e) is, in this case, constitutes an important factor in finding out what they intended under that provision. 'Past practice' in applying such a provision, provides material facts to determine what the Parties intended."

In Goodyear Atomic Corporation, 1956, 27 L.A. 634, the arbitrator held: "We now come to the matter of McConnell. It follows from the preceding analysis that he should have been given an overtime turn on March 3, 1956. But it does not automatically follow, as the Union argues, that he therefore be compensated for time lost. On the one hand, retroactive compensation for overtime lost is tantamount to payment for work not done; and that could spell an undue burden on the Company. On the other hand, an error in overtime allocation a corresponding amount of overtime can be equitably rectified by providing overtime for the aggrieved employee, provided such overtime is provided within a reasonable time from the date of the error."

ployee fall within any particular grade". It is unlikely that the omission was accidental. It seems to us that such a contract, involving a large, complicated, modern refinery, contemplates play in the joints—a number of instances when there will be disagreement between company and union as to job classification. The refinery cannot cease operating while the parties decide what employee should do a particular job. Instead, the company representative assigns the work according to his best judgment and if the assignment is incorrect, as the Union might see it, the question may be settled by the grievance procedure and arbitration. The settlement of a job classification is sufficient justification in itself for resort to arbitration. There is no reason to assume that the parties must have intended a penalty to be implied in order to make the contract operative. And there is no basis for asserting that without damages the union has a right but not a remedy: the remedy is settlement of the classification or proper assignment. The union is not in the position of an ordinary private litigant asserting a claim for breach of contract. Here, for example, as we read the correspondence between the Union and the Company, whatever interest the particular aggrieved employee may have had in receiving equivalent work at the same pay, instead of damages, was lost in the shuffle, overridden by the company-union struggle over the principle of paying for work not performed.

■ Section 8-1 provides that "work peculiar to a classification shall be performed by employees assigned to that classification". Nowhere in Section 8 is there any provision for a penalty or for damages for a misassignment. But a remedy is expressly provided or probably implied in other sections of the contract, such as those dealing with vacations, jury duty, severance pay, annuities, and funeral leaves. Section 5-7, dealing with overtime, states: "It is the intent of the Company to equalize overtime among employees of the same job classification insofar as it may be practical." This provision declares that the Company intends to equalize "overtime" (work), but it imposes no absolute obligation, refers to no remedy, and contains no inference that damages will be awarded in case of misassignment. (In making this statement, and in the opinion generally, this Court is not passing on any remedy the aggrieved employee or the Union may have for misassigned overtime work. That issue is not before us. We are simply pointing out that the contract contains no express or implied provision covering a money award for misassignment of overtime, from which might be drawn the inference that the remedy was a matter of "interpretation" or "performance" of the contract and therefore an arbitrable issue.)

We return to our starting point. The Company did not agree to submit all differences to arbitration but "only differences relating to the interpretation or performance" of the agreement. The Company policy is against paying two employees for overtime worked by one. Granted broad approval of arbitration, this Court must consider whether the parties intended a third person to alter basic Company policy through the medium of an arbitration procedure. The correctness of the work assignment is a matter of concern to the individual aggrieved employee. It is also a matter of concern to a union interested in strict observance of craft lines and generally equal distribution of overtime benefits. But subjecting the Company to punitive damages in order to discourage future misassignments and overturning the Company's policy of paying only for work performed goes beyond rectifying individual grievances and beyond the ordinary arbitrative process. There is not much of a contract between the parties and there is not much stability of the company-union relationship, if an important term may be added to a contract and a fundamental change made in the operation of a plant because a dispute is

traceable to its genesis in an individual grievance.[11]

The real difference between the parties is over the company policy: no work—no pay. The bone of contention between the Company and the Union is whether a mistake in work assignment should be rectified by damages to the aggrieved employee or by equivalent pay for work performed. This is an over-all labor-management issue that involves, on the one hand, efficient plant management and the economics of production, and, on the other hand, protection of an individual worker through union organization. The proper forum for settlement of the dispute is the bargaining table. The proper persons to make the settlement are the representatives of the Union and the Company, not some third arbitrator.[12] So, at least, was the intention of the parties as we read the contract we are required to interpret. In reaching this conclusion we have sought to escape the binds of a narrow, stultifying construction of a legal document. We have sought to construe the contract as a collective bargaining agreement to be read in the context of (1) the collective bargaining process, (2) the background of the particular dispute, (3) the nature of labor arbitration, and (4) the mandate of the Supreme Court in Lincoln Mills.

Judgment is affirmed.

11. In Textron, Inc., Esmond Mills and Textile Workers Union of America (CIO) 1949, 12 L.A. 475 the union requested severance pay for workers discharged when one of Textron Mills was closed. The arbitration clause was broad. It allowed "any dispute, difference, disagreement or controversy of any nature or character \* \* \* to be referred by either party to arbitration". The arbitrator held that the claim to severance was not arbitrable: "Despite my conviction that on equitable grounds there is much merit to the Union's request for severance pay, I am compelled as an arbitrator to give careful consideration to the parties' rights under their collective agreements. Granted the broad nature of the arbitration clause in this agreement, one must nevertheless consider whether the parties intended to permit a third party, through the medium of the arbitration clause, to drastically alter the basic nature of their contractual commitments. I cannot believe this to be the case. The substantive contract issues are contained in the parties' agreement which was drawn for a specific period. It could hardly be deemed an agreement if there could be constant additions to its basic terms by virtue of new demands carried to arbitration during its life. One of the basic purposes of a collective agreement is to furnish stability to the parties' relationship by defining the limits of their rights and obligations. This end is hardly served by a holding that additions to the structure of their relationship of an unknown and unforeseen character can constantly be carried to arbitration during the agreement's existence."

12. In Douds v. Local 1250, Retail Wholesale Department Store Union, 2 Cir., 1949, 173 F.2d 764, 768, 7 A.L.R.2d 685, Judge Hand referred to a Fifth Circuit holding that grievances "must be understood to be limited to questions of minor importance". Hughes Tool Co. v. National Labor Relations Board, 5 Cir., 1945, 147 F. 2d 69, 158 A.L.R. 1165. On rehearing he felt that Elgin, Joliet & Eastern Ry. Co. v. Burley, 1945, 325 U.S. 711, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886, confirmed this view on the principal matter, and, in this case, Mr. Justice Rutledge distinguished between disputes concerning the making of collective agreements and those over grievances or interpretations. "The first relates to disputes over the formation of collective agreements or efforts to secure them," continued Justice Rutledge. "They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past. The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future."

HUTCHESON, Chief Judge (concurring specially).

) I concur fully in what is said and held, and the way in which it is said and held, in the majority opinion, including the use made of footnote 12, which our dissenting brother does not like, and, but for his animadversions and admonitions evoked by what he regards as our obdurate refusal to follow the teachings of his dissenting opinion in Lincoln Mills of Alabama v. Textile Workers, 5 Cir., 230 F.2d 81, 89, 92, I should be content. Since, however, apparently on the basis of the success in the Supreme Court of his dissenting opinion in the Lincoln Mills case, he has in this opinion set himself up as general critic and censor of the court in the field of arbitration, I feel it my right and duty, as one who was not in the Lincoln Mills case and whose withers are therefore unwrung by it, to speak up. Deprecating the ebullient enthusiasm of my younger brother as pioneer, teacher and guide in the role of judicial activist, which he seems to have assumed, I venture to suggest to him that before taking too seriously his role of leader in our court of an activist movement to deride and destroy the ancient landmarks of the law, he take a little time off to read and reflect upon these words from one of the great English legal historians:

"Philosophical speculation about law and politics is an attractive pursuit. A small knowledge of the rules of law, a sympathy with hardships which have been observed and a little ingenuity, are sufficient to make a very pretty theory. It is a harder task to become a master of Anglo-American law by using the history of that law to discover the principles which underlie its rules, and to elucidate the manner in which these principles have been developed and adapted to meet the infinite complexities of life in different ages. Such students of our law will learn even though at second hand, something of the practical wisdom which comes from knowledge of affairs.

They will for that reason be able to suggest solutions of present problems which will depend not merely on their own unaided genius, but on the accumulated wisdom of the past." Holdsworth, Some Lessons from Our Legal History, 105.

JOHN R. BROWN, Circuit Judge (dissenting).

Perhaps I see more in this case than my Brothers. But, while I can enthusiastically adopt so many portions of the opinion, especially parts I and II, I think in the final analysis that what they do is the same old effort to sugar-coat what, to the judiciary, has long been a bitter pill—the idea that someone other than a court can properly adjudicate disputes; that in the field of human disputes lawyers and ex-lawyers as judges alone have the Keys to the Kingdom. Of course, the approach of many jurisdictions which, with jealous eye, scanned all such devices lest they infringe upon or oust the Courts from their historic role, was long ago rejected for Federal Courts. To this notion Judge Hough, in United States Asphalt Refining Co. v. Trinidad Lake Petroleum Co., D.C.S.D.N.Y., 1915, 222 F. 1006, 1007, retorted: "A more unworthy genesis cannot be imagined." See also Lincoln Mills of Alabama v. Textile Workers Union, CIO, 5 Cir., 1956, 230 F.2d 81, 89, 92 (dissenting opinion), note 7 and related text. But the feeling has a hardy tenacity and decisions of this kind are the transfusions that give a few more days, or years, to an idea that has long since earned a decent interment.

To reach this result the Court seizes onto a single case involving a commercial, not a labor-management, dispute, Marchant v. Mead-Morrison Mfg. Co., 1929, 252 N.Y. 284, 169 N.E. 386, and then drags in, see note 12, though wholly irrelevant, the supposed distinction between "major" and "minor" disputes flowing from the unique situation under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., by which jurisdiction is divided between the Railway Adjustment

Board and the Mediation Board. As to Justice Cordozo's observations in the first, much water has since gone over the dam, not the least of which is the command that Federal Courts under Section 301 have the responsibility and duty to fashion a suitable Federal jurisprudence. Textile Workers Union v. Lincoln Mills of Alabama, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. Exercising this judicial inventiveness would require that we at least give something more than a deferential footnote citation, see note 10, to a respectable and substantial body of reported arbitration decisions as a source of learning and enlightenment.

Running through the Court's opinion is the idea that a supposed policy of "no work—no pay" is evidence of an intent not to allow a third party to award damages. Of course, the fact of this case, as the Court acknowledges, is that a worker had a right to a specific task; the company wrongfully deprived him of it; what he seeks is what he would have earned at it. A court of law would award him no less and would pay scant heed to the suggestion that this was paying for work not done. Everyone who risks a claim of breach of contract understands that if a court rejects his denial of breach, he may end up paying twice. He will find no judicial succor on the plea that this is punitive.

The idea of a person deciding a controversy so that his decision may then become the subject of a new and further one—i. e., controversy in bargaining—is repugnant to the scheme of an orderly disposition of disputes before they ripen into the seeds of industrial conflict.

Here, three years later, we are back where we were in Lincoln Mills. There I stated that this court had concluded "that the court with power is yet powerless to proceed—it has power but no tools—in short, the door is open but the hall is empty." 230 F.2d 81, 89. Perhaps today the hall is filled. But what takes place is mere stage acting since the players are engaged in a mere academic exercise, debating fiercely and resolving decisively, but actually delivering

nothing further than the outline of tomorrow's controversy. The fight begins, then, after leaving the hall.

I therefore respectfully dissent.